MARCUS, Circuit Judge,
concurring in part and dissenting in part[1]:
Today this Court strikes down as unconstitutional a central piece of a comprehen *1329 sive economic regulatory scheme enacted by Congress. The majority concludes that Congress does not have the commerce power to require uninsured Americans to obtain health insurance or otherwise pay a financial penalty. The majority does so even though the individual mandate was designed and intended to regulate quintessentially economic conduct in order to ameliorate two large, national problems: first, the substantial cost shifting that occurs when uninsured individuals consume health care services — as virtually all of them will, and many do each year — for which they cannot pay; and, second, the unavailability of health insurance for those who need it most — those with pre-existing conditions and lengthy medical histories.
In the process of striking down the mandate, the majority has ignored many years of Commerce Clause doctrine developed by the Supreme Court. It has ignored the broad power of Congress, in the words of Chief Justice Marshall, “to prescribe the rule by which commerce is to be governed.” Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 196, 6 L.Ed. 23 (1824). It has ignored the undeniable fact that Congress’ commerce power has grown exponentially over the past two centuries, and is now generally accepted as having afforded Congress the authority to create rules regulating large areas of our national economy. It has ignored the Supreme Court’s expansive reading of the Commerce Clause that has provided the very foundation on which Congress already extensively regulates both health insurance and health care services. And it has ignored the long-accepted instruction that we review the constitutionality of an exercise of commerce power not through the lens of formal, categorical distinctions, but rather through a pragmatic one, recognizing, as Justice Holmes put it over one hundred years ago, that “commerce among the states is not a technical legal conception, but a practical one, drawn from the course of business.” Swift & Co. v. United States, 196 U.S. 375, 398, 25 S.Ct. 276, 49 L.Ed. 518 (1905).
The approach taken by the majority has also disregarded the powerful admonitions that acts of Congress are to be examined with a heavy presumption of constitutionality, that the task at hand must be approached with caution, restraint, and great humility, and that we may not lightly conclude that an act of Congress exceeds its enumerated powers. The circumspection this task requires is underscored by recognizing, in the words of Justice Kennedy, the long and difficult “history of the judicial struggle to interpret the Commerce Clause during the transition from the economic system the Founders knew to the single, national market still emergent in our own era.” United States v. Lopez, 514 U.S. 549, 568, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (Kennedy, J., concurring).
The plaintiffs and, indeed, the majority have conceded, as they must, that Congress has the commerce power to impose precisely the same mandate compelling the same class of uninsured individuals to obtain the same kind of insurance, or otherwise pay a penalty, as a necessary condition to receiving health care services, at the time the uninsured seek these services. Nevertheless, the plaintiffs argue that Congress cannot do now what it plainly can do later. In other words, Congress must wait until each component transaction underlying the cost-shifting problem occurs, causing huge increases in costs both for those who have health care insurance and for health care providers, before it may constitutionally act. I can find nothing in logic or law that so circumscribes Congress’ commerce power and yields so anomalous a result.
Although it is surely true that there is no Supreme Court decision squarely on *1330 point dictating the result that the individual mandate is within the commerce power of Congress, the rationale embodied in the Court’s Commerce Clause decisions over more than 75 years makes clear that this legislation falls within Congress’ interstate commerce power. These decisions instruct us to ask whether the target of the regulation is economic in nature and whether Congress had a rational basis to conclude that the regulated conduct has a substantial effect on interstate commerce. It cannot be denied that Congress has promulgated a rule by which to comprehensively regulate the timing and means of payment for the virtually inevitable consumption of health care services. Nor can it be denied that the consumption of health care services by the uninsured has a very substantial impact on interstate commerce — the shifting of substantial costs from those who do not pay to those who do and to the providers who offer care. I therefore respectfully dissent from the majority’s opinion insofar as it strikes down the individual mandate.
I.
A.
A considerable portion of the American population — estimated at 50 million — lacks any form of health care insurance.[2] The individual mandate was designed to ameliorate twin problems related to the uninsured as a class: (1) huge cost shifting from the uninsured, who often don’t pay for their health care services, to those with health insurance and to health care providers; and (2) the inability of many uninsured individuals to obtain much-needed health insurance coverage because they are effectively blacklisted on account of their pre-existing conditions or medical histories. Congress sought to address these problems by requiring non-exempted individuals to pay a penalty, or “shared responsibility payment,” on them tax returns for any month, beginning in 2014, in which they fail to maintain “minimum essential coverage.” 26 U.S.C. § 5000A(a)-(b). And while remaining uninsured is not an option under the Act (at least to avoid paying a penalty), individuals are offered a variety of choices when it comes to satisfying the individual mandate’s “minimum essential coverage” requirement. Many insurance plans will satisfy the individual mandate. These plans fall into five general categories, some of which are further divided into subcategories: (1) government-sponsored programs; (2) eligible employer-sponsored plans; (3) plans purchased on the individual market; (4) grandfathered health plans; or (5) any “other coverage” recognized by the Secretary of Health and Human Services (“HHS”) in coordination with the Secretary of the Treasury. Id. § 5000A(f)(l).
As for the first problem Congress sought to address, it is undeniable that, despite lacking health insurance, the unin *1331 sured are still substantial participants in the market for health care services. And when the uninsured do seek medical care, they often fail to pay all or even most of their costs. On average — and these figures are not disputed — the uninsured pay only 37% of their health care costs out of pocket, while third parties • pay another 26% on their behalf.[3] The remaining costs are uncompensated — they are borne by health care providers and are passed on in the form of increased premiums to individuals who already participate in the insurance market.
Congress’ findings reflect its determination that this problem — the uncompensated consumption of health care services by the uninsured — has national economic consequences that require a national solution through comprehensive federal regulation. See 42 U.S.C. § 18091. As part of the empirical foundation for the individual mandate, Congress quantified the costs associated with the free-riding and cost-shifting problems that result from the provision of uncompensated health care to the uninsured:
The cost of providing uncompensated care to the uninsured was $¿3,000,000,000 [$¿3 billion] in 2008. To pay for this cost, health care providers pass on the cost to private insurers, which pass on the cost to families. This cost-shifting increases family premiums by on average over $1,000 a year. By significantly reducing the number of the uninsured, the [individual mandate], together with the other provisions of this Act, will lower health insurance premiums.
Id. § 18091(a)(2)(F) (emphases added).
The Act thus seeks to regulate the payment for health care consumption through the mechanism of health insurance. As Congress found, the individual mandate “regulates activity that is commercial and economic in nature: economic and financial decisions about how and when health care is paid for, and when health insurance is purchased.” Id. § 18091(a)(2)(A) (emphasis added). In other words, the individual mandate is the means Congress adopted to regulate the timing and method of individuals’ payment for the consumption of health care services.
As for the second problem of millions of uninsured individuals’ being unable to obtain health insurance, Congress sought to dramatically reform the health insurance market by regulating the insurers themselves. The Act bars insurers from using many of the tools they had previously employed to protect themselves against the large costs imposed by high-risk individuals. Thus, insurers may no longer deny coverage or charge higher premiums because of an individual’s pre-existing conditions or medical history. Id. §§ 300gg(a)(l), 300gg-3(a), 300gg-4(a); Act § 2702(a) (to be codified at 42 U.S.C. § 300gg-l(a)). Under the “community rating” provision, insurers may only vary premiums based on (i) whether the plan covers an individual or a family, (ii) rating area, (iii) age, and (iv) tobacco use. 42 U.S.C. § 300gg(a)(l). And under the “guaranteed issue” provisions, insurers *1332 must accept every employer or individual who applies for coverage through the individual or group markets. Act § 2702(a) (to be codified at 42 U.S.C. § 300gg-l(a)). Notably, insurers may no longer offer plans that limit or exclude benefits for individuals’ pre-existing conditions, 42 U.S.C. § 300gg-3(a), nor may they refuse to cover individuals on the basis of (i) health status, (ii) medical condition (including both physical and mental illnesses), (iii) claims experience, (iv) receipt of health care, (v) medical history, (vi) genetic information, (vii) evidence of insurability (including conditions arising out of acts of domestic violence), (viii) disability, or (ix) any other health status factor recognized by the Secretary of HHS, id. § 300gg-4(a).
Congress determined that the individual mandate was essential to the effective implementation of the Act’s insurer regulations — that is, “to creating effective health insurance markets in which improved health insurance products that are guaranteed issue and do not exclude coverage of pre-existing conditions can be sold.” Id. § 18091(a)(2)(I). Congress further found that waiting until the uninsured actually consume health care services before regulating them would effectively be a day late and a dollar short. See id. (“[I]f there were no [individual mandate], many individuals would wait to purchase health insurance until they needed care.”); Liberty Univ., Inc. v. Geithner, 753 F.Supp.2d 611, 634-35 (W.D.Va.2010) (“As Congress stated in its findings, the individual coverage provision is ‘essential’ to th[e] larger regulatory scheme because without it, individuals would postpone [acquiring] health insurance until they need substantial care, at which point the Act would obligate insurers to cover them at the same cost as everyone else. This would increase the cost of health insurance and decrease the number of insured individuals — precisely the harms that Congress sought to address. ...”); Gov’t Br. at 19 (citing testimony before Congress that a “health insurance market could never survive or even form if people could buy their insurance on the way to the hospital” (internal quotation marks omitted)).
Congress also made findings supporting the proposition that the markets for health insurance and health care services are deeply and inextricably bound together and indicated clearly that it sought to regulate across them both. Congress understood that health insurance and health care consumption are linked as a factual matter. Health insurance is the means by which most of our national health care costs are paid for; in 2009, private and government insurance financed approximately 75% of health care spending. Gov’t Br. at 9 (citing non-disputed data from the Centers for Medicare and Medicaid Services (“CMS”)). Moreover, Congress expressly connected the increased participation in the health insurance market that it expected to result from the individual mandate with “increasing the supply of, and demand for, health care services.” 42 U.S.C. § 18091(a)(2)(C). On a more basic level, Congress also understood that “[h]ealth insurance is not bought for its own sake; it is bought to pay for medical expenses.” Gov’t Br. at 39 (citing M. Moshe Porat et al., Market Insurance Versus Self Insurance: The Tax-Differential Treatment and Its Social Cost, 58 J. Risk & Ins. 657, 668 (1991); Martin S. Feldstein, The Welfare Loss of Excess Health Insurance, 81 J. Pol. Econ. 251, 253 (1973) [hereinafter Welfare Loss] (“Health insurance is purchased not as a final consumption good but as a means of paying for the future stochastic purchases of health services.”)); see also Brief for Econ. Scholars *1333 as Amici Curiae Supporting the Government (“Gov’t Econ. Br.”) at 12 (“Medical care is the set of services that make one healthier, or prevent deterioration in health. Health insurance is a mechanism for spreading the costs of that medical care across people or over time, from a period when the cost would be overwhelming to periods when costs are more manageable.”).
B.
1.
Congress’ commerce power to regulate is, as Chief Justice Marshall taught us almost two hundred years ago, the power “to prescribe the rule by which commerce is to be governed. This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution.” Gibbons, 22 U.S. at 196. It is precisely this power to prescribe rules governing commerce that Congress lawfully exercised in enacting the individual mandate.
It is clear that Congress’ rule-making power extends to both the health insurance and health care markets, areas of commerce that Congress has long regulated and regulated heavily. First, the parties all agree (as they must) that Congress’ commerce power lawfully extends to the regulation of insurance in general, as the Supreme Court concluded more than 60 years ago in United States v. South-Eastern Underwriters Ass’n, 322 U.S. 533, 552-53, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944). Indeed, Congress expressly relied on this proposition in enacting the individual mandate. See 42 U.S.C. § 18091(a)(3) (citing South-Eastern Underwriters as a basis for Congress’ authority to regulate insurance under the Commerce Clause).[4]
Second, in light of Congress’ undeniable power under the Commerce Clause to regulate the business of insurance generally, it follows — and again there is no dispute— that Congress may also regulate health insurance in particular, which is, after all, a subset of the insurance market. See Charles Fried, Written Testimony Before the Senate Judiciary Committee Hearing on “The Constitutionality of the Affordable Care Act” 1 (Feb. 2, 2011), available at http://judiciary.senate.gov/pdf/ll-02-02 %20Fried%20Testimony.pdf. In fact, Congress has extensively exercised its commerce power to regulate the health insur *1334 anee market for many years, long before the Act was passed. For example, Congress enacted the Employee Retirement Income Security Act of 1974 (“ERISA”), Pub.L. No. 93-406, 88 Stat. 829 (1974), which is a massive piece of legislation regulating the operation of employee benefit plans, including retirement plans, pension plans, and employer-provided health insurance plans. Congress expressly pegged the broad scope of ERISA’s coverage to its Commerce Clause power. 29 U.S.C. § 1001(b) (“It is hereby declared to be the policy of this chapter to protect interstate commerce....”); see also id. § 1003(a). Among other things, the regulatory provisions in Title I of ERISA, 29 U.S.C. § 1001 et seq., set forth “uniform minimum standards to ensure that employee benefit plans are established and maintained in a fair and financially sound manner.” U.S. Dep’t of Labor, Health Benefits, Retirement Standards, and Workers’ Compensation: Employee Benefit Plans, http://www.dol.gov/compliance/ guide/erisa.htm (last visited Aug. 10, 2011). Title I of ERISA governs “most private sector employee benefit plans,” with the most significant exceptions being “plans established or maintained by government entities or churches.” Id.; see also Williams v. Wright, 927 F.2d 1540, 1545 (11th Cir.1991) (concluding that ERISA regulates even “plans covering only a single employee”).
Congressional efforts to regulate health insurance did not end with ERISA. Congress passed the Consolidated Omnibus Budget Reconciliation Act of 1985 (“COBRA”), Pub.L. No. 99-272, 100 Stat. 82 (1986), which contains a wide variety of provisions relating to health care and health insurance. As for health insurance, the most significant reforms were amendments to ERISA, which added “continuation coverage” provisions that allow employees to continue receiving employer-sponsored health insurance for a period following the end of their employment in order to prevent gaps in health insurance coverage. 29 U.S.C. §§ 1161, 1162. And in the Health Insurance Portability and Accountability Act of 1996 (“HIPAA”), Pub.L. No. 104-191, 110 Stat.1936 (1996), Congress amended the Public Health Service Act to add insurance portability provisions that prohibit group health plans— including ERISA plans — from discriminating against individual participants and beneficiaries based on health status, that require insurers to offer coverage to small businesses, and that limit pre-existing condition exclusions. See 29 U.S.C. §§ 1181— 1183.
Under its commerce power, Congress has also repeatedly regulated the content of private health insurers’ policies. See, e.g., Mental Health Parity Act of 1996, Pub.L. No. 104-204, § 702, 110 Stat. 2874, 2944 (1996) (regulating limits on mental health benefits); Newborns’ and Mothers’ Health Protection Act of 1996, Pub.L. No. 104-204, § 603, 110 Stat. 2874, 2935 (1996) (requiring maternity coverage to provide at least a 48-hour hospital stay); Women’s Health and Cancer Rights Act of 1998, Pub.L. No. 105-277, § 902, 112 Stat. 2681, 2681-436 (1998) (requiring certain plans to offer benefits related to mastectomies); Paul Wellstone and Pete Domeniei Mental Health Parity and Addiction Equity Act of 2008, Pub.L. No. 110-343, § 512, 122 Stat. 3765, 3881 (2008) (providing for parity between mental healtb/substance abuse disorder benefits and medical/surgical benefits).
Third, it is equally clear that Congress’ power under the Commerce Clause likewise extends to the regulation of the provi *1335 sion and consumption of health care services. Indeed, for many years, Congress has substantially regulated both health care providers and the commodities that those providers may use. As far back as 1946, Congress enacted the Hospital Survey and Construction Act (also known as the “Hill-Burton Act”), Pub.L. No. 79-725, 60 Stat. 1040 (1946), which appropriated funds for the construction of new hospitals in the post-World War II economy. The Hill-Burton Act required hospitals receiving federal construction or renovation funds to provide care to “all persons residing in the territorial area” and to provide a “reasonable volume” of free care to indigent patients. See 42 U.S.C. § 291c(e).
The requirement that hospitals provide free care was strengthened and broadened, when, as part of COBRA, Congress enacted the Emergency Medical Treatment and Active Labor Act (“EMTALA”). COBRA, Pub.L. No. 99-272, § 9121, 100 Stat. 82, 164 (1986). EMTALA requires all hospitals that receive Medicare funds to screen and stabilize, if possible, any patient who comes in with an “emergency medical condition.” 42 U.S.C. § 1395dd(a)-(b); see also Roberts v. Galen of Va., Inc., 525 U.S. 249, 250-51, 119 S.Ct. 685, 142 L.Ed.2d 648 (1999) (per curiam). EMTALA also restricts the ability of hospitals to transfer a patient until he is stable or a medical determination is made that transfer is necessary. 42 U.S.C. § 1395dd(c). EMTALA’s provisions are backed by both civil fines and a private cause of action for those harmed by a hospital’s failure to comply. Id. § 1395dd(d).
Congress has also regulated health care providers (and, as mentioned, health care insurers) through HIPAA. The definition of “health care provider” under HIPAA is extraordinarily broad, covering any “person or organization who furnishes, bills, or is paid for health care in the normal course of business.” 45 C.F.R. § 160.103. And in 2009, Congress expanded HIPAA’s coverage even further to include “business associates” of health care providers and health insurers. See Health Information Technology for Economic and Clinical Health Act, Pub.L. No. 111-5, §§ 13401, 13404, 123 Stat. 115, 260, 264 (2009); 45 C.F.R. § 160.103. In addition to the insurance portability provisions, HIPAA includes a number of privacy provisions that “govern[ ] the use and disclosure of protected health information” by health care providers and health insurers, Sneed v. Pan Am. Hosp., 370 Fed.Appx. 47, 50 (11th Cir. 2010) (per curiam) (unpublished), as well as protect the privacy of employees’ health information against inquiries by their employers. HIPAA even regulates what information health care providers may communicate to one another. See generally 45 C.F.R. §§ 164.102-164.534; 42 U.S.C. § 1320d-2. HIPAA also requires health care providers to follow several administrative requirements, including the development of physical and technical privacy safeguards and employee training. See 45 C.F.R. §§ 164.308,164.310,164.312.
Fourth, Congress has extensively regulated under its commerce power the commodities used in the health care services market, most notably drugs and medical devices. For example, in the Food, Drug, and Cosmetics Act, Congress delegated to the Food and Drug Administration the authority to screen and approve drugs and medical devices for use in commerce, and to regulate their continued use once approved. See, e.g., 21 U.S.C. §§ 351, 352, 355(a), 360c, 360e, 360j(e).
Fifth, the majority and all the parties also agree that Congress’ commerce power *1336 extends to the regulation of the price to be paid for the consumption of health care services. Medicare is the most pervasive example. Since 1983, the Medicare program has set the fees it pays to hospitals through a prospective payment system that assigns a fixed amount to each service provided rather than reimbursing hospitals for their actual costs. See United States v. Whiteside, 285 F.3d 1345, 1346 (11th. Cir. 2002). In 1989, Congress also set a federally determined fee schedule for Medicare payments to physicians. Omnibus Budget Reconciliation Act of 1989, Pub.L. No. 101— 239, § 6102, 103 Stat. 2106, 2169 (1989). In this way, Congress directly sets the prices for health care services paid for under Medicare.[5]
Beyond Congress’ already substantial regulation of the price of health care services through Medicare and Medicaid, under controlling precedent Congress may lawfully regulate prices for all manner of health care consumption, however wise or unwise that regulation may be. In fact, the Supreme Court has said that Congress may regulate or even fix prices in interstate markets, either directly or by engaging in the “stimulation of commerce” through regulation. Wickard v. Filburn, 317 U.S. 111, 128, 63 S.Ct. 82, 87 L.Ed. 122 (1942) (“It is well established ... that the power to regulate commerce includes the power to regulate the prices at which commodities in that commerce are dealt in and practices affecting such prices.”); accord Gonzales v. Raich, 545 U.S. 1, 18-19, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005); see also Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 394, 60 S.Ct. 907, 84 L.Ed. 1263 (1940) (holding that Congress could not only regulate price, but could also attach “other conditions to the flow of a commodity in interstate [commerce]”); id. (“To regulate the price for ... transactions is to regulate commerce itself, and not alone its antecedent conditions or its ultimate consequences.” (quoting Carter v. Carter Coal Co., 298 U.S. 238, 326, 56 S.Ct. 855, 80 L.Ed. 1160 (1936) (Cardozo, J., dissenting in part and concurring in the judgment in part))).
Sixth, and perhaps most significantly, Congress’ commerce power includes the power to prescribe rules cutting across the two linked markets of health insurance and health care services. Both the congressional intent to link the two and the empirical relation between the purchase of health insurance and the consumption of health care services are clear. Accordingly, in determining whether Congress has lawfully exercised its commerce power, courts must examine “the entire transaction, of which [the] contract [for insurance] is but a part, in order to determine whether there may be a chain of events which becomes interstate commerce.” South-Eastern Underwriters, 322 U.S. at 547, 64 S.Ct. 1162. I am hard pressed to see how the relevant “chain of events” here does not include the substantial consumption of health care services by the uninsured.
*1337 2.
The plaintiffs assert, nevertheless, that in enacting the individual mandate Congress was limited to regulating a single industry at a single point in time — in other words, it could only look at the health insurance market standing alone. In the plaintiffs’ view, Congress could not mandate the purchase of insurance as a means of ameliorating a national problem arising in the related but distinct market for health care services. The majority appears to have adopted this view, concluding that the relevant conduct targeted by Congress is not the uncompensated consumption of health care services by the uninsured, but rather only the decision to forego health insurance. Maj. Op. at 1293, 1297-98. This approach is wooden, formalistic, and myopic. The plaintiffs and the majority would view the uninsured in a freeze-framed still, captured, like a photograph, in a single moment in time. They contend that Congress cannot constitutionally regulate the uninsured as a class at that single moment, because at that moment any particular uninsured individual may be healthy, may be sitting in his living room, or may be doing nothing at all. The only way the plaintiffs and the majority can round even the first base of their argument against the mandate is by excluding from Congress’ purview, for no principled reason that I can discern, the cost-shifting problems that arise in the health care services market.
This blinkered approach cannot readily be squared with the well-settled principle that, in reviewing whether Congress has acted within its enumerated powers, courts must look at the nature of the problem Congress sought to address, based on economic and practical realities. See Swift & Co., 196 U.S. at 398, 25 S.Ct. 276 (“[C]ommerce among the states is not a technical legal conception, but a practical one, drawn from the course of business.”); Wickard, 317 U.S. at 123-24, 63 S.Ct. 82 (“[Rjeeognition of the relevance of the economic effects in the application of the Commerce Clause ... has made the mechanical application of legal formulas no longer feasible.”); NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 41-42, 57 S.Ct. 615, 81 L.Ed. 893 (1937) (observing that “interstate commerce itself is a practical conception”); N. Am. Co. v. SEC, 327 U.S. 686, 705, 66 S.Ct. 785, 90 L.Ed. 945 (1946) (“Congress is not bound by technical legal conceptions. Commerce itself is an intensely practical matter. To deal with it effectively, Congress must be able to act in terms of economic and financial realities.” (citation omitted)); Lopez, 514 U.S. at 571, 574, 115 S.Ct. 1624 (Kennedy, J., concurring) (favoring a pragmatic approach to Congress’ commerce power grounded in “broad principles of economic practicality” and a “practical conception of commercial regulation”); Raich, 545 U.S. at 25 n. 35, 125 S.Ct. 2195. When the individual mandate is viewed through a more pragmatic and less stilted lens, it is clear that Congress has addressed a substantial economic problem: the uninsured get sick or injured, seek health care services they cannot afford, and shift these unpaid costs onto others.
Moreover, despite their contention that Congress is limited to regulating in a single industry, the plaintiffs nevertheless concede that Congress may use its rule-making power to regulate the market for health insurance as a vehicle or means to address the cost-shifting problems arising in the market for health care services. They have conceded, both in their briefs and at oral argument, that Congress may constitutionally regulate the consumption of health care services by the uninsured at *1338 the time they actually seek medical care. The plaintiffs acknowledge — as does the majority — that Congress may constitutionally require the uninsured to obtain health care insurance on the hospital doorstep, or that Congress may otherwise impose a penalty on those who attempt to consume health care services without insurance. States Br. at 31-32 (“Supreme Court precedent allows Congress to regulate [the practice of consuming health care services without insurance] — for example, by imposing restrictions or penalties on individuals who attempt to consume health care services without insurance.”); Maj. Op. at 1295 (“[W]hen the uninsured actually enter the stream of commerce and consume health care, Congress may regulate their activity at the point of consumption.”); see also Florida ex rel. Bondi v. U.S. Dep’t of Health & Human Servs., No. 3:10-cv-91-RV/EMT, 780 F.Supp.2d 1256, 1291, 2011 WL 285683, at *26 (N.D.Fla. Jan. 31, 2011) (“Congress plainly has the power to regulate [the uninsured] ... at the time that they initially seek medical eare[], a fact with which the plaintiffs agree.”).[6] Thus, all of the parties agree that, at the time of health care consumption, Congress may lawfully cut across a distinct market and impose a financial penalty designed to compel the uninsured to obtain health insurance. And Congress may do so even where the uninsured would otherwise voluntarily choose to finance the consumption of health care services out of pocket, without buying insurance.
If the plaintiffs had argued that Congress cannot constitutionally force anyone to buy health insurance at any time as a means of paying for health care, they at least would have evinced the virtue of consistency. But instead, the plaintiffs’ concession undermines their claim that Congress has exceeded its rule-making power by regulating in one industry to address a problem found in another, at least where the two industries are so closely bound together. After all, even at the point of consuming health care services, individuals may wish to remain “inactive” in the health insurance market. But the plaintiffs and the majority concede that Congress may nevertheless compel individuals at that point to purchase a private insurance product.
Despite this concession, the plaintiffs contend that the regulation of commerce necessarily presupposes a pre-existing voluntary activity to be regulated. The plaintiffs’ activity/inactivity dichotomy, however, is nowhere to be found in the text of the Commerce Clause, nor in the jurisprudence surrounding it. The language of the Commerce Clause itself draws no distinction between activity and inactivity. The seven operative words speak broadly about Congress’ power “[t]o regulate Commerce ... among the several States.” U.S. Const, art. I, § 8, cl. 3. The power to regulate is the power “to prescribe the rule by which commerce is to be governed.” Gibbons, 22 U.S. at 196. And *1339 while the power of Congress is limited to specific objects, it is “plenary as to those objects.” Id. at 197. Creating an artificial doctrinal distinction between activity and inactivity is thus novel and unprecedented, resembling the categorical limits on Congress’ commerce power the Supreme Court swept away long ago.
The plaintiffs claim, nevertheless, that the individual mandate exceeds Congress’ commerce power because it improperly conscripts uninsured individuals — who are presently inactive in the health insurance market — to unwillingly enter the stream of commerce to purchase health insurance they would not otherwise choose to buy. The plaintiffs and the majority would have Congress wait at the water’s edge until the uninsured literally enter the emergency room. In other words, they say, Congress may not legislate prophylactieally, but instead must wait until the cost-shifting problem has boiled over, causing huge increases in costs for those who have health care insurance (through increased premiums), and for those who provide health care services.
At bottom, the plaintiffs’ argument seems to boil down only to a temporal question: can Congress, under the Commerce Clause, regulate how and when health care services are paid for by requiring individuals — -virtually all of whom will consume health care services and most of whom have done so already — to pay now for those services through the mechanism of health insurance? As I see it, the answer to whether Congress can make this temporal jump under its Commerce Clause power is yes.
There is no doctrinal basis for requiring Congress to wait until the cost-shifting problem materializes for each uninsured person before it may regulate the uninsured as a class. The majority’s imposition of a strict temporal requirement that congressional regulation only apply to individuals who first engage in specific market transactions in the health care services market is at war with the idea that Congress may adopt “reasonable preventive measures” to avoid future disruptions of interstate commerce. Consol. Edison Co. v. NLRB, 305 U.S. 197, 222, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (“[I]t cannot be maintained that the exertion of federal power must await the disruption of [interstate or foreign] commerce.”); see also Katzenbach v. McClung, 379 U.S. 294, 301, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964) (quoting same, and noting that “Congress was not required to await the total dislocation of commerce”); Stevens v. United States, 440 F.2d 144, 152 (6th Cir.1971) (“It is not necessary for Congress to await the total dislocation of commerce before it may provide reasonable preventive measures for the protection of commerce.” (citing Katzenbach, 379 U.S. at 301, 85 S.Ct. 377)), limited on other grounds by United States v. Bass, 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971); NLRB v. Sunshine Mining Co., 110 F.2d 780, 784 (9th Cir. 1940). In Consolidated Edison, the Supreme Court explained that, through the National Labor Relations Act — which regulates labor practices — “Congress did not attempt to deal with particular instances” in which interstate commerce was disrupted, concluding that Congress did not need to wait until labor practices actually disrupted interstate commerce before it could regulate.[7] 305 U.S. at 222, 59 S.Ct. 206. In other words, Congress may lawfully regulate present conduct to prevent future *1340 disruptions of interstate commerce from occurring.
What’s more, and even more basic, here the disruption of interstate commerce is already occurring. The majority inexplicably claims that the individual mandate regulates “the mere possibility of future activity,” Maj. Op. at 1294, but as we speak, the uninsured are consuming health care services in large numbers and shifting costs onto others. By ignoring the close relationship between the health insurance and health care services markets, the plaintiffs and the majority seek to avoid the hard fact that the uninsured as a class are actively consuming substantial quantities of health care services now — not just next week, next month, or next year. The uninsured make more than 20 million visits to emergency rooms each year; 68% of the uninsured had routine checkups in the past five years; and 50% had one in the past two years.[8] See U.S. Dep’t of HHS, New Data Say Uninsured Account for Nearly One-Fifth of Emergency Room Visits (July 15, 2009), available at http://www. hhs.gov/news/press/2009pres/07/20090715b. html; June E. O’Neill & Dave M. O’Neill, Emp’t Policies Inst., Who Are the Uninsured? An Analysis of America’s Uninsured Population, Their Characteristics and Their Health 20-21 & tbl.9 (2009), available at http://epionline.org/studies/ oneill_06-2009.pdf; see also Hidden Health Tax, supra, at 2 (observing that the uninsured consumed $116 billion worth of health care services in 2008); Gov’t Econ. Br. at 10 (“57 percent of the 40 million people uninsured in all of 2007 used medical services that year.” (emphasis added)); NFIB Br. at 5 (citing same 57% statistic). In addition, there were more than two million hospitalizations — not just emergency room visits, but actual admissions to a hospital — of the uninsured in 2008 alone. U.S. Dep’t of HHS, ASPE Research Brief, The Value of Health Insurance: Few of the Uninsured Have Adequate Resources To Pay Potential Hospital Bills 5 (2011), available at http://aspe.hhs.gov/health/ reports/2011/valueofinsurance/rb.pdf.
In light of these undisputed figures, there can be little question that substantial numbers of uninsured Americans are currently active participants in the health care services market, and that many of these uninsured currently consume health care services for which they cannot or do not pay. This is, in every real and meaningful sense, classic economic activity, which, as Congress’ findings tell us, has a profound effect on commerce. See Thomas More Law Ctr. v. Obama, 651 F.3d 529, 556, 2011 WL 2556039, at *24 (6th Cir. June 29, 2011) (Sutton, J., concurring) (“No matter how you slice the relevant market — as obtaining health care, as paying for health care, as insuring for health care — all of these activities affect interstate commerce, in a substantial way.”).[9] Once the artificial *1341 barrier drawn between the health insurance and health care services markets breaks down, the plaintiffs’ inactivity argument collapses. And there can be no doubt that Congress rationally linked the two markets. Its very findings accompanying the mandate detail at length the impact that going uninsured has on the broader availability of health insurance and on the costs associated with the consumption of health care services. See 42 U.S.C. § 18091(a)(2). I observe again that “[hjealth insurance is purchased not as a final consumption good but as a means of paying for the future stochastic purchase of health care services.” Welfare Loss, supra, at 253. And virtually all of us will have the misfortune of having to consume health care services at some unknown point for some unknown malady and at some uncertain price. Each of us remains susceptible to sudden and unpredictable injury. No one can opt out of illness, disability, and death. These, we all must accept, are facts of life. Thus, even if I were to accept the plaintiffs’ distinction between activity and inactivity, the facts undermine the distinction here. The inevitable consumption of health care services by the uninsured is sufficient activity to subject them to congressional regulation.
3.
The plaintiffs and the majority also object to the mandate on different grounds— that it is “overinclusive” insofar as it applies to: “those who do not enter the health care market at all” (“non-consumers”), and those who consume health care services but pay for their services in full and thus do not shift costs (“non-cost-shifters”). Maj. Op. at 1293.
The majority understates the point when it acknowledges that “overinclusiveness may not be fatal for constitutional purposes.” Id. Indeed, the Supreme Court has made it abundantly clear that Congress is not required to “legislate with scientific exactitude.” Raich, 545 U.S. at 17, 125 S.Ct. 2195. Rather, “[wjhen Congress decides that the total incidence of a practice poses a threat to a national market, it may regulate the entire class.” Id. (emphases added) (internal quotation marks omitted). As Justice Holmes put it in Westfall v. United States, 274 U.S. 256, 47 S.Ct. 629, 71 L.Ed. 1036 (1927), “when it is necessary in order to prevent an evil to make the law embrace more than the precise thing to be prevented [Congress] may do so.” Id. at 259, 47 S.Ct. 629. There is simply no requirement under the Commerce Clause that Congress choose the least restrictive means at its disposal to accomplish its legitimate objectives. Nor is there a requirement that Congress target only those uninsured individuals who will consume health care services at a particular point in time or just those who will be unable to pay for the health care services they consume. Congress concluded that the “total incidence” of health care consumption by the uninsured threatened the national health insurance and health care services markets. It was free to regulate the “entire class” of the uninsured.[10]
Moreover, even if I were to accept the notion that Congress, in regulating com *1342 merce, was obliged to somehow draw the class more narrowly, the subclass of “non-consumers” — those individuals who will never enter the health care services market at all — is surely minuscule. The plaintiffs emphasize that it is “not strictly true” that everyone will participate in the health care services market. States Br. at 30. But the only elaboration the plaintiffs offer on this point is that some individuals will not participate because of “religious scruples” or the vaguely-put “individual circumstances.” Id. As for the first, it does not get the plaintiffs very far, because religious groups that opt out of the health care services or health insurance markets may also seek exemption from the individual mandate. 26 U.S.C. § 5000A(d)(2). And as for “individual circumstances,” presumably what the plaintiffs mean is that a few individuals either will fortuitously avoid ill health altogether, or — more likely — will fail to consume health care services due to an immediately fatal accident or the like. I am unable to draw a relevant constitutional distinction between the virtual inevitability of health care consumption and the absolute, 100% inevitability of health care consumption. There is less of a chance that an individual will go through his entire life without ever consuming health care services than there is that he will win the Irish Sweepstakes at the very moment he is struck by lightning. Nor are there more than a minuscule number of Americans who could afford to take on the financial risk of a personal medical catastrophe out of their own pockets. Yet, on the basis of these slight mathematical possibilities would the majority bring down the individual mandate and all that may fall with it.
Congress has wide regulatory latitude to address “the extent of financial risk-taking in the health care services market,” Gov’t Reply Br. at 15, which in its view is “a threat to a national market,” Raich, 545 U.S. at 17, 125 S.Ct. 2195. The fact that an exceedingly small set of individuals may go their whole lives without consuming health care services or can afford to go it alone poses no obstacle to Congress’ ability under the Commerce Clause to regulate the uninsured as a class.
Similarly, a group of economists who filed an amicus brief in support of the plaintiffs object to the individual mandate by disputing the substantiality of the cost-shifting impact the mandate seeks to address. First, they claim that the individual mandate targets the young and healthy and that the annual costs of uncompensated care for those individuals is much less than $43 billion. See Brief for Economists as Amici Curiae Supporting the Plaintiffs *1343 (“Plaintiffs Econ. Br.”) at 3, 10, 13. The point is unpersuasive, because it conflates the scope of the individual mandate with its relative benefits for different population groups. The individual mandate applies to all non-exempted individuals, 26 U.S.C. § 5000A(a), and while the young and healthy may benefit less than other groups from having health insurance, “[i]t is of the essence of regulation that it lays a restraining hand on the self-interest of the regulated and that advantages from the regulation commonly fall to others,” Wickard, 317 U.S. at 129, 63 S.Ct. 82. Balancing different groups’ competing economic interests is not a constitutional concern for the courts to calibrate, but rather is “wisely left under our system to resolution by the Congress under its more flexible and responsible legislative process.” Id. Moreover, the argument that the mandate targets the young and healthy and that, therefore, this Court should only look at the economic impact on interstate commerce of those individuals is not even consistent with the plaintiffs’ own suggestion that the individual mandate regulates “everyone at every moment of their lives, from cradle to grave.” States Br. at 29.
The economists also suggest that even if we look at the $43 billion figure as a whole, that amount is less than 1.8% of overall annual health care spending (which Congress found was $2.5 trillion, or 17.6% of the national economy, in 2009, 42 U.S.C. § 18091(a)(2)(B)), and, therefore, the “alleged cost-shifting problem” is relatively modest and fails to justify the individual mandate. Plaintiffs Econ. Br. at 9-10. The argument is unconvincing. It would be novel indeed to examine whether a problem “substantially affects” interstate commerce by comparing the economic impact of the problem to the total size of the regulated market. The argument would also lead to the perverse conclusion that Congress has less regulatory power the larger the national market at issue. But in any event, there can be no doubt that $43 billion is a substantial amount by any accounting. Even the economists (as well as the district court) recognize that the amount is “not insignificant.” Plaintiffs Econ. Br. at 10; accord Florida, 780 F.Supp.2d at 1291, 2011 WL 285683, at *26 (noting that $43 billion “is clearly a large amount of money”). In this connection, I am reminded of the comment often attributed to the late Illinois Senator Everett McKinley Dirksen: “A billion here, a billion there, and pretty soon you’re talking about real money.”
Relying heavily on the economists’ brief, the majority goes even further and subjects Congress’ findings to an analysis that looks startlingly like strict scrutiny review. The majority engages in a breakdown of who among the uninsured are responsible for the $43 billion, presumably in order to show that the mandate will not be the most efficacious means of ameliorating the cost-shifting problem. See Maj. Op. at 1298-1300. For instance, the majority claims that low-income individuals and illegal aliens (or other nonresidents) together are responsible for around half of the total cost shifting, yet are exempted from either the mandate or its penalty. Id. at 1298-99. But even on the majority’s own terms, a substantial number of cost-shifters are not exempted from the mandate or its penalty, and there was nothing irrational about Congress’ decision to subject to the mandate those individuals who could reasonably afford health insurance in the first place.
More fundamentally, however, as I see it, the majority’s searching inquiry throughout its opinion into whether the *1344 individual mandate fully solves the problems Congress aimed to solve, or whether there may have been more efficacious ways to do so, probes far beyond the proper scope of a court’s Commerce Clause review. The majority suggests any number of changes to the legislation that would, it claims, improve it. Thus, for example, the majority offers that Congress should have legislated with a finer scalpel by inserting some element in the statute calling for a “case-by-case inquiry” of each regulated individual’s conduct. Id. at 1294 (internal quotation marks omitted). And the majority would have the IRS enforce the mandate more aggressively. See id. at 1311; id. at 1326 (describing the mandate as “porous and toothless”).
Quite simply, the majority would presume to sit as a superlegislature, offering ways in which Congress could have legislated more efficaciously or more narrowly. This approach ignores the wide regulatory latitude afforded to Congress, under its Commerce Clause power, to address what in its view are substantial problems, and it misapprehends the role of a reviewing court. As nonelected judicial officers, we are not afforded the opportunity to rewrite statutes we don’t like, or to craft a legislative response more sharply than the legislative branch of government has chosen. What we are obliged to do is to determine whether the congressional enactment falls within the boundaries of Art. I 8, cl. 3. In examining the constitutionality of legislation grounded in Congress’ commerce power, “[w]e need not determine whether [the regulated] activities, taken in the aggregate, substantially affect interstate commerce in fact.” Raich, 545 U.S. at 22, 125 S.Ct. 2195 (emphasis added). Rather, all we need to do — indeed, all we are permitted to do — is determine “whether a ‘rational basis’ exists for so concluding.” Id. The courts are not called upon to judge the wisdom or efficacy of the challenged statutory scheme. See, e.g., id. at 9, 125 S.Ct. 2195 (“The question before us, however, is not whether it is wise to enforce the statute in these circumstances.”); Wickard, 317 U.S. at 129, 63 S.Ct. 82 (“And with the wisdom, workability, or fairness[ ] of the plan of regulation we have nothing to do.”). As Justice Cardozo put it, “[w]hether wisdom or unwisdom resides in the scheme of [the statute at issue], it is not for us to say. The answer to such inquiries must come from Congress, not the courts.” Helvering v. Davis, 301 U.S. 619, 644, 57 S.Ct. 904, 81 L.Ed. 1307 (1937); see also Thomas More Law Ctr., 651 F.3d at 566, 2011 WL 2556039, at *33 (Sutton, J., concurring) (“Time assuredly will bring to light the policy strengths and weaknesses of using the individual mandate as part of this national legislation, allowing the peoples’ political representatives, rather than their judges, to have the primary say over its utility.” (emphasis added)).
The majority says, nevertheless, that we are compelled to approach the individual mandate with “caution” and with “greater cause for doubt,” Maj. Op. at 1305, because insurance and health care are “areas of traditional state concern,” id. at 1304. While it is true that insurance and health care are, generally speaking, areas of traditional state regulation, this observation in no way undermines Congress’ commerce power to regulate concurrently in these areas. The sheer size of the programs Congress has created underscores the extensiveness of its regulation of the health insurance and health care industries. “In 2010, 47.5 million people were covered by Medicare.... ” 2011 Annual Report of the Boards of Trustees of the Federal Hospital Insurance and Federal Supplementary Medical Insurance Trust *1345 Funds 4 (2011), available at http://www. cms.gov/ReportsTrustFunds/downloads/tr 2011.pdf. Medicaid is similarly massive. As of December 2008, approximately 44.8 million people were covered by Medicaid. The Kaiser Commission on Medicaid and the Uninsured, Medicaid Enrollment in 50 States 1 (2010), available at http://www.kff. org/medicaid/upload/7606-05.pdf. And as the government points out, Medicare and Medicaid accounted for roughly $750 billion of federal spending in 2009 alone. Gov’t Br. at 10. It would surely come as a great shock to Congress, or, for that matter, to the 47.5 million people covered by Medicare, the 44.8 million people covered by Medicaid, and the overwhelming number of employers, health insurers, and health care providers regulated by ERISA, COBRA, and HIPAA, to learn that, because the health care industry also “falls within the sphere of traditional state regulation,” Maj. Op. at 1305, Congress was somehow skating on thin constitutional ice when it enacted these laws.
4.
In the course of its opinion, the majority also attaches great significance to the unprecedented nature of the legislation before us. It is surely true that, as the district court concluded, the individual mandate is a novel exercise of Congress’ Commerce Clause power. Florida, 780 F.Supp.2d at 1283-86, 2011 WL 285683, at *20-21. But the mere fact of its novelty does not yield its unconstitutionality. See Garcia v. Vanguard Car Rental USA, Inc., 540 F.3d 1242, 1252 (11th Cir.2008) (upholding, under the Commerce and Necessary and Proper Clauses, the constitutionality of the Graves Amendment, 49 U.S.C. § 30106, even though it was a “novel” statute employing the “relatively novel” theory that the rental car market should be protected “by deregulating it”). Every new proposal is in some way unprecedented before it is tried. And to draw the line against any new congressional enactment simply because of its novelty ignores the lessons found in the Supreme Court’s Commerce Clause cases. For example, in Wickard the Court squarely recognized that the case presented an unprecedented expansion of the Commerce Clause power before then embracing that expansion. 317 U.S. at 120, 63 S.Ct. 82 (“Even today, when this power has been held to have great latitude, there is no decision of this Court that such activities [“local” activities such as production, manufacturing, and mining] may be regulated where no part of the product is intended for interstate commerce or intermingled with the subjects thereof.”). The truth is that any ruling this Court issues on the individual mandate’s constitutionality is necessarily a departure from existing case law because the legislation and the issues presented are new. That the Supreme Court has never before upheld a regulation of this kind can hardly be decisive; it has never rejected one either.
Indeed, when measured against the kinds of sweeping changes we have seen in the past, the individual mandate is far from a cataclysmic expansion of Congress’ commerce power. Even the briefest examination of the growth of Congress’ commerce power over the past 75 years makes the point. Facing the practical realities of an emergent, highly integrated national economy, the Supreme Court abandoned the categorical and formalistic distinctions that it had erected initially, in favor of a pragmatic view of commerce drawn from the course of business. The Court had previously held that broad categories of economic life, such as agriculture, insurance, labor, manufacturing, mining, and *1346 production were antecedent to commerce itself, which was once viewed as being limited to the movement of the fruits of those antecedent activities in and among the states. But a more pragmatic view began to take hold by the mid-1980s. The Court’s earlier restrictive view of commerce did not survive the New Deal-era cases, where the Supreme Court swiftly brought all of these categories within the lawful ambit of Congress’ commerce power. See, e.g., Jones & Laughlin Steel, 301 U.S. at 40, 57 S.Ct. 615 (“It is thus apparent that the fact that the employees here concerned were engaged in production is not determinative. The question remains as to the effect upon interstate commerce of the labor practice involved.”); United States v. Darby, 312 U.S. 100, 115-17, 61 S.Ct. 451, 85 L.Ed. 609 (1941) (“[W]e conclude that the prohibition of the shipment interstate of goods produced under the forbidden substandard labor conditions is within the constitutional authority of Congress.”); Wickard, 317 U.S. at 124-25, 63 S.Ct. 82 (“Whether the subject of the regulation in question was ‘production,’ ‘consumption,’ or ‘marketing’ [of wheat] is ... not material for purposes of deciding the question of federal power before us.... [E]ven if appellee’s activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce .... ”); South-Eastern Underwriters, 322 U.S. at 553, 64 S.Ct. 1162 (“No commercial enterprise of any kind which conducts its activities across state lines has been held to be wholly beyond the regulatory power of Congress under the Commerce Clause. We cannot make an exception of the business of insurance.”).
The Court did not stop there. It expanded the scope of Congress’ commerce power from the regulation of the “intercourse” of goods moving across borders to the regulation of wholly intrastate conduct that substantially affected interstate commerce. See Darby, 312 U.S. at 119-20 & n. 3, 61 S.Ct. 451. Indeed, Wickard involved a jump arguably far greater than the one we face today. In order to regulate price, Congress could penalize conduct — Filburn’s growing wheat above a fixed quota for his own personal consumption — absent any indicia that Filburn would ever enter into the interstate wheat market. Justice Jackson, writing for the Court, recognized this as a novel exercise of the commerce power. Wickard, 317 U.S. at 120, 63 S.Ct. 82. The Court held that Congress could nonetheless regulate the price of wheat by restricting its production, even on a small farm where it was grown purely for personal consumption. And, according to the Court, if the regulation had the natural and probable effect of “forcing some farmers into the market to buy what they could provide for themselves” absent the regulation, so be it. Id. at 129, 63 S.Ct. 82 (emphasis added).
In Wickard, the Court expanded Congress’ commerce power further still, concluding that the impact or effect on interstate commerce is not measured case by case, or person by person, but rather in an aggregated way. Id. at 127-28, 63 S.Ct. 82. That Filburn’s “own contribution to the demand for wheat may be trivial by itself is not enough to remove him from the scope of federal regulation where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial.” Id. (emphasis added); see also Darby, 312 U.S. at 123, 61 S.Ct. 451 (“[Congress] recognized that in present day industry, competition by a small part may affect the whole and that the total effect of the competition of many *1347 small producers may be great.”); NLRB v. Fainblatt, 306 U.S. 601, 606, 59 S.Ct. 668, 83 L.Ed. 1014 (1939) (“The power of Congress to regulate interstate commerce is plenary and extends to all such commerce be it great or small.”). Building upon earlier inklings of an aggregation principle found in Darby and Fainblatt, the Court firmly established that Congress may regulate classes of local activities that, only in the aggregate, have a substantial effect on interstate commerce.[11]
In a pair of notable civil rights cases, Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964), and Katzenbach, 379 U.S. 294, 85 S.Ct. 377, the Supreme Court continued to read the Commerce Clause in an expansive way. The Court upheld nondiscrimination legislation, grounded in the Commerce Clause, that required hoteliers and restaurateurs to enter into economic transactions with racial minorities (indeed, with individuals of any race, color, religion, or national origin) on the same terms as any other patrons (or exit their respective businesses altogether). The Court underscored that “the power of Congress to promote interstate commerce also includes the power to regulate the local incidents thereof, including local activities in both the States of origin and destination, which might have a substantial and harmful effect upon that commerce.” Heart of Atlanta, 379 U.S. at 258, 85 S.Ct. 348. The Court concluded that, having entered the stream of commerce, these sellers could be forced by Congress to engage in economic transactions into which they would not otherwise enter.
The plaintiffs are quick to point out, however, that the Commerce Clause has not simply expanded unabated. In rejecting the constitutionality of the individual mandate, the plaintiffs and the majority rely heavily upon Lopez, 514 U.S. 549, 115 S.Ct. 1624, and United States v. Morrison, 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000), the only two Supreme Court cases in the past 75 years to hold that an act of Congress exceeded its commerce power. Neither Lopez, where the Court struck down a statute criminalizing the possession of a firearm within 1000 feet of a school, nor Morrison, where the Court struck down a statute creating a federal civil remedy for victims of gender-motivated felonious acts of violence, answers the question we face today.
Indeed, in Raich, 545 U.S. 1, 125 S.Ct. 2195, decided five years after Morrison, the Supreme Court reaffirmed the vitality of Wickard, and specifically applied its holding in a challenge to the constitutionality of the Controlled Substances Act (“CSA”). The Court emphatically distinguished Lopez and Morrison, observing that the statutes at issue in those cases were singular prohibitions regulating wholly noneconomic criminal behavior. The CSA, on the other hand, was characterized as “a lengthy and detailed statute creating a comprehensive framework for regulating the production, distribution, and possession of five classes of ‘controlled substances.’ ” Raich, 545 U.S. at 24, 125 S.Ct. 2195. The Court found that, “[ujnlike those at issue in Lopez and Morrison, the activities regulated by the CSA are quiñ *1348 tessentially economic.” Id. at 25, 125 S.Ct. 2195.
Thus, much as in Raich, while Lopez and Morrison remind us that there are discernible limits on Congress’ commerce power, the limits drawn in those two cases are of limited help in this one. As a panel of this Circuit recently stated, “Raich makes clear that when a statute regulates economic or commercial activity, Lopez and Morrison are inapposite.” Garcia, 540 F.3d at 1252. Indeed, when “we are not ... dealing with a single-subject statute whose single subject is itself non-economic (e.g., possession of a gun in a school zone or gender-motivated violence),” Morrison and Lopez have little applicability and instead “Raich guides our analysis.” United States v. Maxwell (“Maxwell II ”), 446 F.3d 1210, 1216 n. 6 (11th Cir.2006); see also United States v. Paige, 604 F.3d 1268, 1273 (11th Cir.2010) (per curiam). Lopez and Morrison each involved an effort to regulate noneconomic activity (criminal conduct); in neither instance did Congress seek to broadly regulate an entire industry; and, unlike in this case, the criminal conduct regulated in those cases was only linked to interstate commerce in a highly attenuated fashion that required piling inference upon inference. Whatever problems there may be with the constitutionality of the individual mandate, they cannot be found in Lopez or Morrison. See Part II.A, infra.
The historical growth oí Congress’ commerce power powerfully suggests that, contrary to the arguments advanced by the plaintiffs, upholding the individual mandate would be far from a cosmic expansion of the boundaries of the Commerce Clause. These past expansions have not been random, accidental, or in any way contrary to first principles or an original understanding of the Constitution. As the Supreme Court has observed, “[t]he Federal Government undertakes activities today that would have been unimaginable to the Framers.” United States v. Comstock, - U.S. -, 130 S.Ct. 1949, 1965, 176 L.Ed.2d 878 (2010) (quoting New York v. United States, 505 U.S. 144, 157, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992)). Indeed, the Framers purposely drafted “a Constitution capable of such resilience through time.” Id.; see also McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 415, 4 L.Ed. 579 (1819) (describing the Constitution as a document “intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs”).
The long and short of it is that Congress has promulgated a rule (the individual mandate) by which to comprehensively regulate the timing and means of payment for the virtually inevitable consumption of health care services, and to thereby regulate commerce. The individual mandate was enacted as part of a broad scheme to regulate health insurance and health care services, industries already heavily regulated by Congress. Congress made express legislative findings detailing the economic problems it saw, and how the mandate would ameliorate those problems. And the substantial impact on interstate commerce cannot be denied. Article I 8, cl. 3 requires no more than this.
C.
The individual mandate is also a valid means under the Necessary and Proper Clause to further the regulatory end of the Act’s insurance reforms. “It has been long recognized that Congress has the power to pass laws or regulations neces *1349 sary and proper to carrying out [its] commerce clause power.” United States v. Ambert, 561 F.3d 1202, 1211 (11th Cir. 2009). Under the Necessary and Proper Clause, Congress is empowered “[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing [Art. I, § 8] Powers.” U.S. Const, art. I, § 8, cl. 18. Both the Supreme Court and this Circuit have said that “in determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute, we look to see whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power.” Comstock, 130 S.Ct. at 1956 (emphasis added); United States v. Belfast, 611 F.3d 783, 804 (11th Cir.2010).
The constitutionality of the “end” — that is, the Act’s insurer regulations — is both clear and unchallenged, as even the district court recognized. Florida, 780 F.Supp.2d at 1298, 2011 WL 285683, at *32 (“[T]he end of regulating the health care insurance industry (including preventing insurers from excluding or charging higher rates to people with pre-existing conditions) is clearly legitimate and within the scope of the constitution.” (internal quotation marks omitted)). Once it has identified a legitimate and constitutional end, Congress has an expansive choice of means. As Chief Justice Marshall enduringly articulated “[i]n language that has come to define the scope of the Necessary and Proper Clause,” Comstock, 130 S.Ct. at 1956:
Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional.
McCulloch, 17 U.S. at 421. In addition, Chief Justice Marshall broadly defined the term “necessary.” It does not mean “absolutely necessary,” but rather only “convenient, or useful” or “conducive” to the “beneficial exercise” of one or more of Congress’ enumerated powers. Comstock, 130 S.Ct. at 1956 (quoting McCulloch, 17 U.S. at 413, 414, 418).
It is clear under this expansive definition of “necessary,” the validity of which was recently reaffirmed by the Supreme Court in Comstock, that requiring the purchase of health insurance is “convenient,” “useful,” or “conducive” to effectively implementing the Act’s insurer regulations. As the states that tried to effectuate guaranteed issue and community rating reforms without some form of individual mandate attest, trying to do the former without the latter simply does not work. See, e.g., Brief for Am. Ass’n of People with Disabilities et al. as Amici Curiae Supporting the Government at 5-6 (“Kentucky, Maine, New Hampshire, New Jersey, New York, Vermont, and Washington enacted legislation that required insurers to guarantee issue to all consumers in the individual market, but did not have a minimum coverage provision.... All seven states suffered from sky-rocketing insurance premium costs, reductions in individuals with coverage, and reductions in insurance products and providers.” (footnote omitted)); Brief for Governor of Wash, as Amicus Curiae Supporting the Government at 2 (“Washington knows firsthand the necessity of universal coverage because of the problems it experienced when it eliminated barriers to insurance coverage, like preexisting condition restrictions, without also imposing a minimum coverage requirement.”); Brief for Law Professors as Amici Curiae Supporting the Government at 17 (“[A]fter Kentucky enacted re *1350 form, all but two insurers (one State-run) abandoned the State.”).[12] In this light, the individual mandate is “necessary” to the end of regulating insurers’ underwriting practices without running insurers out of business entirely — a point the district court recognized. Florida, 780 F.Supp.2d at 1298, 2011 WL 285683, at *33 (“The defendants have asserted again and again that the individual mandate is absolutely ‘necessary’ and ‘essential’ for the Act to operate as it was intended by Congress. I accept that it is.”).
The plaintiffs also claim that the individual mandate exceeds Congress’ power because it is not “proper” — that is, because it is inconsistent with “the letter and the spirit of the constitution.” McCulloch, 17 U.S. at 421. I have little doubt that the individual mandate is also “proper.” It violates no other provision of the Constitution.[13] Cf. Comstock, 130 S.Ct. at 1957 (“[T]he present statute’s validity under provisions of the Constitution other than the Necessary and Proper Clause is an issue that is not before us.... [Therefore], the relevant inquiry is simply whether the means chosen are reasonably adapted to the attainment of a legitimate end under the commerce power....” (internal quotation marks omitted)). And the mandate is undoubtedly “rationally related” to the end of effectuating the Act’s guaranteed issue and community rating reforms. Id. at 1956; Belfast, 611 F.3d at 804. The mandate arguably renders the insurer regulations practically and economically feasible. Congress found that without the mandate, “many individuals would wait to purchase health insurance until they needed care,” 42 U.S.C. § 18091(a)(2)(I) — that is, until they were sick, which would impose enormous costs on insurers and drive them out of the market. And having observed the failed experience of those states that tried to enact insurer reforms without an individual mandate, Congress rationally concluded that one way to prevent this problem was to require that non-exempted individuals enter the insurance risk pool. The Necessary and Proper Clause requires nothing more.
II.
More fundamentally, the plaintiffs have offered two arguments that, they say, undermine the government’s position that Congress’ commerce power can justify prescribing a rule that compels an individual to buy health insurance. First, they argue that if Congress has the constitutional authority to enact the individual mandate, then there is virtually no limit on its authority, and Art. I, § 8, cl. 3 of the Constitution (whether standing alone or in concert with the Necessary and Proper Clause) would be transformed into a grant of general police power. Second, they offer, although largely implicitly, that the *1351 individual mandate really infringes upon notions of individual liberty and popular sovereignty found either in the Fifth or Tenth Amendments to the Constitution. I take up each argument in turn.
A.
1.
Perhaps at the heart of the plaintiffs’ objection to the mandate — adopted by the majority opinion in conclusion, if not in reasoning[14] — is the notion that allowing the individual mandate to stand will convert Congress’ commerce power into a plenary federal police power, admitting of no limits and knowing of no bounds. The parade of horribles said to follow ineluctably from upholding the individual mandate includes the federal government’s ability to compel us to purchase and consume broccoli, buy General Motors vehicles, and exercise three times a week. However, acknowledging the constitutionality of the individual mandate portends no such impending doom.
At the outset, there is always a danger in evaluating the constitutionality of legislation actually before us solely on the basis of conjecture about what the future may hold. The plaintiffs’ heavy reliance on “floodgate fears” and a “parade of dreadfuls calls to mind wise counsel: ‘Judges and lawyers live on the slippery slope of analogies; they are not supposed to ski it to the bottom.’ ” Buckley v. Am. Constitutional Law Found., Inc., 525 U.S. 182, 194 n. 16, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999) (quoting Robert Bork, The Tempting of America: The Political Seduction of the Law 169 (1990)). Federal courts may only be called on to resolve ripe controversies, and it is difficult and hazardous for courts to prejudge the next case or the one after that in a vacuum, devoid of a factually developed record sharpened in the crucible of the adversarial process. See Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (“[Cjoncrete adverseness ... sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions[.]”). As courts of limited jurisdiction, we ought not lose sight of the legislation before us, viewed in the context of the discrete issues and facts presented. I have little doubt that the federal courts will be fully capable of addressing future problems raised in future cases in the fullness of time.
*1352 But a more basic answer is this: upholding the individual mandate leaves fully intact all of the existing limitations drawn around Congress’ Commerce Clause power. To begin with, Congress is limited by the constitutional text and Supreme Court doctrine largely to prescribing rules regulating economic behavior that has a substantial effect on interstate commerce. These powerful limits afford no problem in this case, because Congress has undeniably prescribed a rule (the individual mandate) to regulate economic behavior (consumption of health care services by the uninsured) that has a powerful impact on how, when, and by whom payment is made for health care services. Indeed, the conduct regulated by the Act is even more “quintessentially economic” in nature than the cultivation, possession, and personal use of controlled substances, see Raich, 545 U.S. at 25, 125 S.Ct. 2195, or the cultivation of wheat for personal consumption, see Wickard, 317 U.S. at 119, 63 S.Ct. 82.
In Lopez and Morrison, the Supreme Court began to flesh out some of the outer limits surrounding Art. I, § 8, cl. 3. Chief Justice Rehnquist, writing for the Court in both instances, posited a series of “significant considerations,” none of which pose any problem in this case. See Morrison, 529 U.S. at 609-12, 120 S.Ct. 1740. First, he observed that the regulated conduct at issue in Lopez and Morrison was plainly of a noneconomic nature — again, the possession of a handgun within 1000 feet of a school in Lopez, and gender-motivated felonious acts of violence in Morrison. See id. at 610, 120 S.Ct. 1740 (“[A] fair reading of Lopez shows that the noneconomic, criminal nature of the conduct at issue was central to our decision in that case.”). Here, in sharp contrast, Congress has prescribed a rule governing purely economic behavior. As I’ve noted already, the Act addresses an economic problem of enormous dimension — $43 billion of annual cost shifting from the uninsured to insured individuals and health care providers, 42 U.S.C. § 18091(a)(2)(F) — by prescribing an economic rule governing the timing and method of payment for health care services. In short, the first problem identified in Lopez and Morrison — that the statutes reached purely intrastate, noneconomic behavior — is not found in this case, and thus the mandate does not, at least for this reason, penetrate beyond the outer limits of Congress’ Commerce Clause power.
A second powerful consideration identified by the Court in both Lopez and Morrison was that the nexus between the criminal conduct regulated by the legislation and its impact — even if taken in the aggregate — on interstate commerce was remote and wholly attenuated, and on its own terms provided no limiting principle surrounding the exercise of Congress’ commerce power. In both Lopez and Morrison, the government relied on a lengthy inferential chain of causal reasoning in order to show that the criminal conduct regulated had a substantial effect on interstate commerce. In Lopez — where Congress had made no factual findings regarding the effects upon interstate commerce of gun possession in a school zone— the government had to argue, among other things, that the possession of firearms near schools had the natural effect of disrupting the educational process, and that this disruption, over time, would in turn lower the economic productivity of our citizens, causing an adverse effect on the national economy. See Lopez, 514 U.S. at 563-64, 115 S.Ct. 1624. It’s no surprise, then, that the Court found the critical link *1353 to interstate commerce wanting, and concluded that if this chain of reasoning were an acceptable means of bridging the gap between the regulated conduct and commerce, precious little would fall outside the ambit of Congress’ commerce power. Id. at 564, 115 S.Ct. 1624. By the same token, in Morrison, the Court found wanting Congress’ chain of reasoning' — that felonious acts of violence against women would, inter alia, cause lost hours in the workplace and drive up hospital costs and insurance premiums, which in turn would have an adverse effect on the national economy. See Morrison, 529 U.S. at 615, 120 S.Ct. 1740. The problem remained the same as in Lopez, even though in Morrison, Congress had sought to draw the causal inferences itself through express factual findings. Again, the causal reasoning that was required to link the regulated criminal conduct to interstate commerce was lengthy and attenuated. And again, the very method of reasoning offered by Congress afforded no limitations on its commerce power. Id. at 615-16, 120 S.Ct. 1740.
In this case, no such complex and attenuated causal story is necessary to locate the regulated conduct’s nexus with interstate commerce. Here, the substantial effect on commerce occurs directly and immediately when the uninsured consume health care services in large numbers, do not pay for them in full or maybe even at all, and thereby shift powerful economic costs onto insured individuals and health care providers (as Congress found they do). The nexus between the regulated conduct and interstate commerce could not be more direct. I am at a loss to find even a single “inferential leapt],” Maj. Op. at 1302, required to link them. Moreover, Congress unambiguously and in considerable detail drew the connection between the regulated conduct and its substantial effect on interstate commerce through extensive findings of fact. See 42 U.S.C. § 18091. Contrary to the majority’s claim, here there is no need “to pile inference upon inference,” Lopez, 514 U.S. at 567, 115 S.Ct. 1624, to draw the critical nexus, and, therefore, we face no unlimited exercise of congressional power for that reason.
Moreover, in sharp contrast to Lopez and Morrison, we are confronted today with a comprehensive economic statute, not a one-off, criminal prohibition. See Raich, 545 U.S. at 23-24, 125 S.Ct. 2195 (drawing a sharp distinction between “brief, single-subject statute[s]” divorced from a larger regulatory scheme and “lengthy and detailed statute[s] creating a comprehensive framework for regulating” an entire market). The individual mandate is “an essential part of a larger regulation of economic activity,” without which “the regulatory scheme would be undercut,” Lopez, 514 U.S. at 561, 115 S.Ct. 1624, and the Supreme Court has endorsed the constitutionality of such comprehensive, economic regulatory schemes, Raich, 545 U.S. at 24-25, 125 S.Ct. 2195; see also Model v. Indiana, 452 U.S. 314, 329 n. 17, 101 S.Ct. 2376, 69 L.Ed.2d 40 (1981) (“A complex regulatory program such as established by the [Surface Mining] Act can survive a Commerce Clause challenge without a showing that every single facet of the program is independently and directly related to a valid congressional goal. It is enough that the challenged provisions are an integral part of the regulatory program and that the regulatory scheme when considered as a whole satisfies this test.”); Raich, 545 U.S. at 36, 125 S.Ct. 2195 (Scalia, J., concurring in the judgment) (“Though the conduct in Lopez was not economic, the Court nevertheless recognized that it could be regulated as ‘an *1354 essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated.’ ” (quoting Lopez, 514 U.S. at 561, 115 S.Ct. 1624)). And, according to Eleventh Circuit precedent, “where Congress comprehensively regulates economic activity, it may constitutionally regulate intrastate activity, whether economic or not, so long as the inability to do so would undermine Congress’s ability to implement effectively the overlying economic regulatory scheme.” Maxwell II, 446 F.3d at 1215 (footnote omitted).
The majority, in an effort to distance itself from this precedent, suggests that, because Raich involved an as-applied challenge, the inquiry into whether challenged legislation is an “essential part of a larger regulation of economic activity” is only appropriate in as-applied challenges, as opposed to facial ones. Maj. Op. at 1307-08. In other words, the majority seems to be saying that, because “the Supreme Court has to date never sustained a statute on the basis of the ‘larger regulatory scheme’ doctrine in a facial challenge,” id. at 1307-OS, it is irrelevant to the question of the individual mandate’s constitutionality that the mandate is an essential part of a larger economic regulatory scheme. There is no doctrinal basis for this view. In Lopez itself, the Court applied this principle in the context of a facial challenge. In Raich, the Court plainly recognized that, unlike the challenge it faced, the challenges to the constitutionality of the Gun-Free School Zones Act in Lopez, and, for that matter, to Title III of the Violence Against Women Act in Morrison, were facial challenges. Justice Stevens, writing for the majority in Raich, said: “Here, respondents ask us to excise individual applications of a concededly valid statutory scheme. In contrast, in both Lopez and Morrison, the parties asserted that a particular statute or provision fell outside Congress’ commerce power in its entirety,” the very definition of a facial challenge. Raich, 545 U.S. at 23, 125 S.Ct. 2195 (emphasis added). Indeed, Justice Thomas, dissenting, likewise expressly recognized that “[i]n Lopez and Morrison, the parties asserted facial challenges.” Id. at 71, 125 S.Ct. 2195 (Thomas, J., dissenting). And of course in Lopez, the Court, for the first time, applied this very doctrine, explaining that even though the Gun-Free School Zones Act targeted purely local, noneconomic behavior, the Court could have upheld it nonetheless if it had been an “essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated.” Lopez, 514 U.S. at 561, 115 S.Ct. 1624. Moreover, a panel of this Court has recently explained in binding precedent that “what distinguished Raich from Morrison and Lopez ... was the comprehensiveness of the economic component of the regulation,” Maxwell II, 446 F.3d at 1214 — not whether the challenge was facial or as-applied.
Furthermore, the majority’s view that the individual mandate is not an essential part of the Act’s concededly economic regulatory scheme, see Maj. Op. at 1309-11, cannot be squared with the economic realities of the health insurance business or the legislative realities of the Act. Nor can this view be squared with the contrary judgment reached by Congress on this very point. Thus, for example, the majority appears to simply cast aside Congress’ finding that the individual mandate “is essential to creating effective health insurance markets in which improved health insurance products that are guaranteed is *1355 sue and do not exclude coverage of preexisting conditions can be sold.” 42 U.S.C. § 18091(a)(2)(I). In Maxwell II, we explained that “courts have only a limited role in second-guessing” Congress’ judgments about whether leaving a class of conduct outside of federal control would “undercut!] Congress’s unquestioned authority to regulate the broader interstate market.” 446 F.3d at 1215 (internal quotation marks omitted). Faced with evidence that the insurance industry would collapse if the Act’s guaranteed issue and community rating provisions were implemented without the individual mandate, Congress had more than “a rational basis for concluding,” Raich, 545 U.S. at 19, 125 S.Ct. 2195, that the individual mandate was essential to the success of the Act’s concededly valid and quintessentially economic insurer reforms.[15] In short, the real and substantial limits on the commerce power set forth by the Supreme Court in Lopez and Morrison would be left wholly intact if we were to uphold the individual mandate.
Because the impact on interstate commerce of the conduct that Congress sought to regulate through the individual mandate is so clear and immediate, this case is readily distinguishable from many of the plaintiffs’ suggested hypothetical horribles, which suffer from the inference-piling reasoning condemned in Lopez and Morrison. Thus, for example, in arguing that Congress could force us to purchase broccoli, the plaintiffs necessarily reason as follows: everyone is a participant in the food market; if people buy more broccoli, they will eat more broccoli; eating more broccoli will, in the long run, improve people’s health; this, in turn, will improve overall worker productivity, thus affecting our national economy. Such reasoning violates the cautionary note that “under the Government’s ‘national productivity’ reasoning, Congress could regulate any activity that it found was related to the economic productivity of individual citizens.... Thus, if we were to accept the Government’s arguments, we are hard pressed to posit any activity by an individual that Congress is without power to regulate.” Lopez, 514 U.S. at 564, 115 S.Ct. 1624. By contrast, the economic problem that Congress sought to address through the individual mandate does not depend on any remote or long-term effects on economic productivity stemming from individuals’ health care choices; indeed, the mandate does not compel individuals to seek health care at all, much less any particular form of it. Instead, Congress rationally found that the uninsured’s inevitable, substantial, and of *1356 ten uncompensated consumption of health care services — of any form — in and of itself substantially affects the national economy.
2.
Moreover, this case does not open the floodgates to an unbounded Commerce Clause power because the particular factual circumstances are truly unique, and not susceptible to replication elsewhere. This factual uniqueness would render any holding in this case limited. I add the unremarkable observation that the holding of every case is bounded by the peculiar fact pattern arising therein. See Licciardello v. Lovelady, 544 F.3d 1280, 1288 n. 8 (11th Cir.2008) (“Our holding, as always, is limited to the facts before us.”); see also United States v. Hunter, 172 F.3d 1307, 1310 (11th Cir.1999) (Carnes, J., concurring) (“The holdings of a prior decision can reach only as far as the facts and circumstances presented to the Court in the case which produced that decision.”).
The health care services market is characterized by five relevant factors, which, when taken in concert, uniquely converge to create a truly sui generis problem: (1) the unavoidable need that virtually all of us have to consume medical care; (2) the unpredictability of that need; (3) the high costs associated with the consumption of health care services; (4) the inability of providers to refuse to provide care in emergency situations; and, largely as a result of the previous four factors, (5) the very significant cost shifting that underlies the way medical care is paid for in this country. Gov’t Econ. Br. at 1.
These are not just five fortuitous descriptors of the health care market, elevated to artificial constitutional significance. Over the last 75 years the Supreme Court has emphatically and repeatedly counseled a pragmatic approach to Commerce Clause analysis, grounded in a “practical” conception of commercial regulation, “drawn from the course of business.” Swift & Co., 196 U.S. at 398, 25 S.Ct. 276; accord Raich, 545 U.S. at 25 n. 35, 125 S.Ct. 2195; Lopez, 514 U.S. at 571, 574, 115 S.Ct. 1624 (Kennedy, J., concurring); Wickard, 317 U.S. at 123-24, 63 S.Ct. 82; Jones & Laughlin Steel, 301 U.S. at 41-42, 57 S.Ct. 615. Legislation enacted pursuant to Congress’ Commerce Clause power cannot be evaluated in a vacuum, but only in light of the peculiar problems Congress sought to address, what Congress chose to regulate, how Congress chose to regulate, and the connection between the regulated conduct and the problem Congress sought to resolve. Courts must always engage in the “hard work” of “identifying] objective markers for confining the analysis in Commerce Clause cases.” Raich, 545 U.S. at 47, 125 S.Ct. 2195 (O’Connor, J., dissenting). Far from being “ad hoc ” and “illusory,” Maj. Op. at 1311, these factual criteria are relevant descriptors, drawn from the course of business, of the economic realities Congress confronted. They are, therefore, precisely what the Court has instructed us to consider in the Commerce Clause analysis. And given these unique characteristics of the health care market and the peculiar way these characteristics converge, the individual mandate was part of a practical solution to the cost-shifting problem Congress sought to address.
The first and most basic of these factors is that no individual can opt out of the health care services market, and thus virtually everyone will consume health care services. Individual participation in the health care services market is properly, therefore, a question of when and how *1357 individuals will consume and pay for such services, not whether they will consume them. The plaintiffs are correct that there are other markets that, if defined broadly enough, no one may opt out of, such as the markets for food, transportation, and shelter. But the hypothetical mandates — that Congress can force individuals to buy broccoli, GM cars, or homes — do not follow. Neither those markets nor their hypothetical mandates resemble the market and mandate here.
In the first place, unlike the needs for food, transportation, and shelter' — which are always present and have largely predictable costs — illness and injury are wholly unpredictable. Individuals who never intend to consume health care, unlike those who never intend to purchase GM cars or broccoli or a home, will nonetheless do so because of accidents, illnesses, and all the vagaries to which one’s health is subject. Indeed, the economists concluded that even the most sophisticated methods of predicting medical spending can explain only 25-35% of the variation in the costs incurred by different individuals; “the vast bulk of [medical] spending needs cannot be forecast in advance.” Gov’t Econ. Br. at 10-11.
In addition, while the costs associated with obtaining food, transportation, and shelter are susceptible to budgeting, this is not the case for health care, which can be so expensive that most everyone must have some access to funds beyond their own resources in order to afford them. Id. at 11-12 (explaining that unpredicted medical costs can eclipse the financial assets of “all but the very well-to-do”); see also Gov’t Reply Br. at 15 (“The ‘frequency, timing and magnitude’ of a given individual’s demand for health care are unknowable.” (quoting Jennifer Prah Ruger, The Moral Foundations of Health Insurance, 100 Q.J. Med. 53, 54-55 (2007))). Moreover, there are lower cost alternatives to purchasing a house or a car, such as renting an apartment, leasing an automobile, or relying on public transportation. There are no realistic alternatives or less expensive substitutes for treating cancer, a heart attack, or a stroke, or for performing a needed organ transplant or hip replacement. Even routine medical procedures, such as MRIs, CT scans, colonoscopies, mammograms, and childbirth, cost more than many Americans can afford. Gov’t Econ. Br. at 11. This is not to say that individuals may not budget and plan as best they can for their health care costs, as many surely do, but the combination of uncertain timing, unpredictable malady, and potentially astronomical cost can nonetheless leave individuals wholly unable to pay for the health care services they consume. Indeed, Congress found that “62 percent of all personal bankruptcies are caused in part by medical expenses.” 42 U.S.C. § 18091(a)(2)(G).
Largely because of these first three factors — that health care costs are inevitable, unpredictable, and often staggeringly high — the health care services market, unlike other markets, is paid for predominantly through the mechanism of insurance.[16] Gov’t Br. at 9 (citing CMS data that payments by private and government *1358 insurers comprise 75% of national health care spending). Insurance is thus already intimately linked to the health care services market. People do not similarly insure against the risk that they will need food or shelter, because these needs are apparent and predictable, and people can reliably budget for them. Although the purchase of a car or a home may often be too expensive for many individuals to afford out of pocket, it would be fanciful indeed to suggest that individuals would insure against the sudden and unpredictable purchase of a home or automobile. The plaintiffs admit that “[rjegulations are ‘plainly adapted’ if they invoke ‘the ordinary means of execution.’ ” NFIB Br. at 42 (quoting McCulloch, 17 U.S. at 409, 421). Insurance is the “ordinary means” of paying for health care services. Thus, a mandate to purchase insurance is more appropriately suited to address the problems of non-payment and cost shifting in the health care services market than it would be to address problems in other markets that do not similarly rely on insurance as the primary method of payment.
The fourth important factor distinguishing the health care market from all other markets — and peculiarly contributing to the cost shifting that Congress sought to address through the mandate — is the fact that individuals may consume health care services without regard to their ability to pay and often without ever paying for them. Unlike any other sellers in any other marketplace, nearly all hospitals are required by law to provide emergency services to anyone, regardless of ability to pay. See EMTALA, 42 U.S.C. § 1395dd. If an individual shows up at the emergency room doorstep with a broken neck from an automobile accident or bleeding from a gunshot wound, or if an individual suffers a heart attack or a stroke, hospitals will not turn him away. Even aside from the federal obligation imposed by EMTALA, by my count, at least ten of the plaintiff states have statutes on the books requiring hospitals with emergency rooms to provide emergency treatment to those in need of it, regardless of ability to pay.[17] Still other plaintiff states have state court judicial rulings imposing similar requirements.[18] And even absent any legal duty, many *1359 hospitals provide free or deeply discounted care as part of their charitable mission, even when the patient’s need does not rise to the level of an emergency. See Thornton v. Sw. Detroit Hosp., 895 F.2d 1131, 1132 (6th Cir.1990) (observing in the application of EMTALA that “American hospitals have a long tradition of giving emergency medical aid to anyone in need who appeared on the emergency room doorstep”). One expert from the Heritage Foundation persuasively illustrated this distinction between health care and other markets when recommending in 1989 that the government impose a mandate “to obtain adequate [health] insurance”:
If a young man wrecks his Porsche and has not had the foresight to obtain insurance, we may commiserate but society feels no obligation to repair his car. But health care is different. If a man is struck down by a heart attack in the street, Americans will care for him whether or not he has insurance. If we find that he has spent his money on other things rather than insurance, we may be angry but we will not deny him services — even if that means more prudent citizens end up paying the tab.
Stuart M. Butler, Heritage Found., The Heritage Lectures 218: Assuring Affordable Health Care for All Americans 6 (1989);[19] see also Gov’t Br. at 37.
This obligation of health care providers to provide free medical care creates market imperfections that fall under a variety of labels: “an externality (a situation where one person’s actions or inactions affect[ ] others), a free-rider problem (where people buy [or consume] a good and leave the costs to others), or a Samaritan’s dilemma (where people choose not to be prepared for emergencies, knowing that others will care for them if needed).” Gov’t Econ. Br. at 14-15. Individuals who decline to purchase health insurance are not held to the full economic consequence of that choice, as society does not refuse medical care to a patient in need, even when its cost far exceeds the individual’s ability to pay. The ability of health care market participants to demand services without paying for them bolsters Congress’ rational conclusion that the individual mandate — which helps to assure payment for services in advance — is peculiarly suited to addressing a unique economic problem in the health care market.[20]
Finally, the four factors described above converge to cause a fifth unique factor of *1360 the health care market: the substantial cost shifting from the uninsured to current participants in the health insurance market and to health care providers. This cost shifting does not occur in other markets, even those in which we all participate, such as transportation, food, or housing. When an individual purchases a home or a car, the purchaser pays all of the cost (whether upfront or over time through a loan or mortgage). My neighbor will not help cover my costs of purchasing a home by paying a higher price for his own house. And I will not pay more for my car, simply because my neighbor cannot afford to buy one for himself. The costs in those markets are borne by the individual purchaser alone. Again, in sharp contrast, the uninsured shift substantial costs to the insured and to health care providers, because the uninsured in the aggregate consume health care services in large numbers and yet bear only a small fraction of the costs for the services they consume. The parties agree that the uninsured fail to pay for 63% of the health care services they receive, and some 37% (amounting to $43 billion) of all health care costs incurred by the uninsured are uncompensated entirely. States Br. at 30-31; Gov’t Reply Br. at 8-9, 11. Congress found that this uncompensated care increases the average insured family’s annual insurance premiums by $1000. 42 U.S.C. § 18091(a)(2)(F). This cost-shifting phenomenon simply does not occur in other industries.[21] Even under the majority’s characterization of the regulated conduct as a “decision not to purchase health insurance,” Maj. Op. at 1310, deciding to self-insure in the health care market, unlike all other “financial decisions of Americans,” id. at 1288, is a decision to pay for your care if you can afford it or to shift costs onto society if you can’t.
In sum, the particular problems riddling the health care industry that Congress sought to address, together with the unique factors that characterize the health care market and its peculiar interconnectedness with the health insurance market, all led Congress to enact the individual mandate as an appropriate means of ameliorating two large national problems. Although these economic factors “are not precise formulations, and in the nature of things they cannot be[,] ... [I] think they point the way to a correct decision of this case.” Lopez, 514 U.S. at 567, 115 S.Ct. 1624; see also id. at 579, 115 S.Ct. 1624 (Kennedy, J., concurring) (“[A]s the branch whose distinctive duty it is to declare ‘what the law is,’ we are often called upon to resolve questions of constitutional law not susceptible to the mechanical application of bright and clear lines.” (cita *1361 tion omitted) (quoting Marbury v. Madison, 5 U.S. (1 Crunch) 137, 177, 2 L.Ed. 60 (1803))). Upholding the mandate under the particular circumstances of this case would do little to pave the way for future congressional mandates that address wholly distinct problems that may arise in powerfully different contexts. While the individual mandate is indeed novel, I cannot accept the charge that it is a “bridge too far.” The individual mandate, viewed in light of the larger economic regulatory scheme of the Act as a whole and the truly unique and interrelated nature of both markets, is a legitimate exercise of Congress’ power under Art. I, § 8, cl. 3 of the Constitution and is not prone to the slippery slope of hypothetical horrors leading to an unlimited federal Commerce Clause power.
B.
Finally, implicit in the plaintiffs’ Commerce Clause challenge, and providing the subtext to much of the majority’s opinion, is the deeply rooted fear that the federal government is infringing upon the individual’s right to be left alone — a fear that is intertwined with a visceral aversion to the government’s making us do something we do not want to do (in this case, buy a product we do not wish to purchase). The plaintiffs say that Congress cannot compel unwilling individuals to engage in a private commercial transaction or otherwise pay a penalty. The difficulty, however, is in finding firm constitutional footing for the objection. The plaintiffs suggest that the claim derives, if anywhere, from either of two constitutional provisions: the Fifth Amendment’s Due Process Clause or the Tenth Amendment. If derived from the Fifth Amendment, the objection, fairly stated, is that the mandate violates individual liberty, as protected by the substantive component of the Due Process Clause. In the alternative, if derived from the Tenth Amendment, the objection is that the individual mandate infringes on the powers, or rights, retained by “the people.”
At the trial court, the plaintiffs squarely raised a Fifth Amendment substantive due process challenge to the individual mandate, which the district court flatly rejected. Florida ex rel. McCollum v. U.S. Dep’t of Health & Human Servs., 716 F.Supp.2d 1120, 1161-62 (N.D.Fla.2010). And while the plaintiffs also challenged the individual mandate on Tenth Amendment grounds, the district court addressed this challenge only implicitly in ruling that the mandate exceeded Congress’ commerce power. Florida, 780 F.Supp.2d at 1298-99, 2011 WL 285683, at *33.
On appeal, the plaintiffs have expressly disclaimed any substantive due process challenge to the individual mandate, although they appear still to advance a Tenth Amendment challenge. Nevertheless, it is clear that individual liberty concerns lurk just beneath the surface, inflecting the plaintiffs’ argument throughout, although largely dressed up in Commerce Clause and Necessary and Proper Clause terms. For example, the state plaintiffs go so far as to say that the individual mandate is “one of the Act’s principal threats to individual liberty,” States Br. at 16, and that upholding it would “sound the death knell for our constitutional structure and individual liberties,” id. at 19. Similarly, the private plaintiffs claim that the individual mandate “exemplifies the threat to individual liberty when Congress exceeds its enumerated powers and attempts to wield a plenary police power.” NFIB Br. at 7. Sounding almost entirely in economic substantive due process, the private *1362 plaintiffs also assert that “[a]mong the most longstanding and fundamental rights of Americans is their freedom from being forced to give their property to, or contract with, other private parties.” Id. at 47. Thus, to the extent the plaintiffs’ individual liberty-based challenge to the individual mandate derives from the Fifth and Tenth Amendments, I address each constitutional source in turn.
The Fifth Amendment provides that “[n]o person shall ... be deprived of life, liberty, or property, without due process of law.” U.S. Const, amend. V. Although the Due Process Clause has both a procedural and a substantive component, only its substantive aspect is implicated here. “The substantive component [of the Due Process Clause] protects fundamental rights that are so implicit in the concept of ordered liberty that neither liberty nor justice would exist if they were sacrificed.” Doe v. Moore, 410 F.3d 1337, 1342 (11th Cir.2005) (internal quotation marks omitted). This narrow band of fundamental rights is largely protected from governmental action, regardless of the procedures employed. Id. at 1343. And any law, whether federal or state, that infringes upon these rights will undergo strict scrutiny review, which means that the law must be “narrowly tailored to serve a compelling state interest.” Id. (quoting Reno v. Flores, 507 U.S. 292, 302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993)). Today, substantive due process protects only a small class of fundamental rights, including “the rights to marry, to have children, to direct the education and upbringing of one’s children, to marital privacy, to use contraception, to bodily integrity, and to abortion,” Washington v. Glucksberg, 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (citations omitted) — a list the Supreme Court has been “very reluctant to expand,” Moore, 410 F.3d at 1343.
In a bygone period known as “the Lochner era,”[22] however, substantive due process was more broadly interpreted as also encompassing and protecting the right, liberty, or freedom of contract. See, e.g., Adkins v. Children’s Hosp. of D.C., 261 U.S. 525, 545, 43 S.Ct. 394, 67 L.Ed. 785 (1923); Adair v. United States, 208 U.S. 161, 174-75, 28 S.Ct. 277, 52 L.Ed. 436 (1908). Through this interpretation of the Due Process Clause, the Supreme Court struck down many federal and state laws that sought to regulate business and industrial conditions. See, e.g., Adkins, 261 U.S. 525, 43 S.Ct. 394 (striking down a federal law fixing minimum wages for women and children in the District of Columbia); Jay Burns Baking Co. v. Bryan, 264 U.S. 504, 44 S.Ct. 412, 68 L.Ed. 813 (1924) (striking down a Nebraska law regulating the weight of loaves of bread for sale).
However, the Supreme Court has long since abandoned the sweeping protection of economic rights through substantive due process. See, e.g., Ferguson v. Skrupa, 372 U.S. 726, 730, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963) (“The doctrine that prevailed in Lochner ... and like cases — that due process authorizes courts to hold laws unconstitutional when they believe the legislature has acted unwisely — has long since been discarded.”); Williamson v. Lee Optical of Okla., Inc., 348 U.S. 483, 488, 75 S.Ct. 461, 99 L.Ed. 563 (1955) (“The day is *1363 gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought.”); West Coast Hotel Co. v. Parrish, 300 U.S. 379, 391, 57 S.Ct. 578, 81 L.Ed. 703 (1937). Today, economic regulations are presumed constitutional, Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976), and are subject only to rational basis review, Vesta Fire Ins. Corp. v. Florida, 141 F.3d 1427, 1430 n. 5 (11th Cir.1998).
In substantive due process cases, binding precedent requires that we “carefully formulat[e]” the alleged fundamental right, Glucksberg, 521 U.S. at 722, 117 S.Ct. 2258, which must be “defined in reference to the scope of the [statute at issue],” Williams v. Att’y Gen. of Ala., 378 F.3d 1232, 1241 (11th Cir.2004). In light of the individual mandate’s scope, the carefully formulated right would be the right of non-exempted individuals to refuse to maintain a minimum level of health insurance. And this right — whether cast as the freedom to contract, the right to remain uninsured, or, in the words of one commentator, the “right to force a society to pay for your medical care by taking a free ride on the system”[23] — cannot be characterized as a “fundamental” one receiving heightened protection under the Due Process Clause. The present state of our jurisprudence does not recognize any such right as a “fundamental” one, “deeply rooted in this Nation’s history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it] were sacrificed.” Williams, 378 F.3d at 1239 (quoting Glucksberg, 521 U.S. at 720-21, 117 S.Ct. 2258).
Since the individual liberty interest asserted by the plaintiffs is not a fundamental right, we are obliged to apply rational basis review, which only asks whether the mandate is rationally related to a legitimate government interest. TRM, Inc. v. United States, 52 F.3d 941, 945 (11th Cir. 1995). Under rational basis review, “legislation must be sustained if there is any conceivable basis for the legislature to believe that the means they have selected will tend to accomplish the desired end.” Id. at 945-46 (internal quotation marks omitted); see also Williams v. Morgan, 478 F.3d 1316, 1320 (11th Cir.2007) (“A statute is constitutional under rational basis scrutiny so long as ‘there is any reasonably conceivable state of facts that could provide a rational basis for the [statute].’ ” (alteration in original) (quoting FCC v. Beach Commc’ns, Inc., 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993))).
Here, Congress rationally found that the individual mandate would address the powerful economic problems associated with cost shifting from the uninsured to the insured and to health care providers, and with the inability of millions of uninsured individuals to obtain health insurance. Thus, to the extent the plaintiffs’ individual liberty concerns are rooted in the Fifth Amendment’s Due Process Clause, they must fail.
The plaintiffs’ more provocative argument is found in the Tenth Amendment, which provides that “[t]he powers not dele *1364 gated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.” U.S. Const, amend. X. The plaintiffs do not explicitly flesh out how the mandate violates the Tenth Amendment. The state plaintiffs cite the Tenth Amendment generally, claiming that “[i]f this Court were to uphold [the individual mandate and the Act’s Medicaid expansion], there would remain little if any power ‘reserved to the States ... or to the people.’ ” States Br. at 3 (alteration in original) (quoting U.S. Const, amend. X).[24] And the private plaintiffs suggest that the portion of the amendment reserving undelegated power to the people provides the basis for their individual liberty claim. See NFIB Br. at 46 (reciting “the Tenth Amendment’s admonition that the non-enumerated powers ‘are reserved to the States respectively, or to the people.’ ” (quoting U.S. Const, amend. X) (emphasis in original)); see also Brief for Cato Institute as Amicus Curiae Supporting the Plaintiffs at 24 (“[T]he text of the Tenth Amendment protects not just state sovereignty, but also popular sovereignty.”).
The Supreme Court, however, has said precious little about the tail end of the Tenth Amendment that reserves power to the people. Indeed, no case, either from the Supreme Court or from any lower federal court, has ever invoked this portion of the amendment to strike down an act of Congress. Instead, the Supreme Court’s Tenth Amendment cases have grappled almost exclusively with the balance of power between the federal government and the states.[25]
In these cases, the Supreme Court has interpreted the Tenth Amendment’s reservation of power to the states to mean that the federal government may not “commandeer[ ] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program.” New York, 505 U.S. at 176, 112 S.Ct. 2408 (quoting Hodel v. Va. Surface Mining & Reclamation Ass’n, 452 U.S. 264, 288, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981)); see also Printz v. United States, 521 U.S. 898, 935, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997) (“The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States’ officers, or those of their political subdivisions, to administer or enforce a federal regulatory program.”). The Court has thus held that federal laws compelling state governments to enact legislation providing for the disposal of radioactive waste, New York, 505 U.S. at 149, 112 S.Ct. 2408, and compelling state agents to conduct background checks on prospective handgun purchasers, *1365 Printz, 521 U.S. at 902, 117 S.Ct. 2365, violate the Tenth Amendment. In so holding, the Supreme Court has explained that the limits the Tenth Amendment imposes on Congress’ power come not from the amendment’s text, but rather from the principle of federalism, or dual sovereignty, that the Tenth Amendment embodies. See New York, 505 U.S. at 156-57, 112 S.Ct. 2408.
But because of the utter lack of Supreme Court (or any other court) precedent, the amendment’s “people” prong provides little, if any, support here. It may be that in time the law will come to breathe practical life into the Tenth Amendment’s reservation of power to the people, but that day has not yet arrived.
Setting aside the lack of any precedent on point, a Tenth Amendment challenge to the individual mandate fails for an additional, and critical, reason: when a federal law is properly within Congress’ delegated power to enact, the Tenth Amendment poses no limit on the exercise of that power. See, e.g., New York, 505 U.S. at 156, 112 S.Ct. 2408 (“If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States----”); Midrash Sephardi Inc. v. Town of Surfside, 366 F.3d 1214, 1242 (11th Cir.2004) (“Because [the Religious Land Use and Institutionalized Persons Act] is a proper exercise of Congress’s power under § 5 of the Fourteenth Amendment, there is no violation of the Tenth Amendment.”); United States v. Williams, 121 F.3d 615, 620 (11th Cir.1997) (“[T]he [Child Support Recovery Act] is a valid exercise of Congress’s power under the Commerce Clause, and Congress’s ‘valid exercise of authority delegated to it under the Constitution does not violate the Tenth Amendment.’ ” (quoting Cheffer v. Reno, 55 F.3d 1517, 1519 (11th Cir.1995))); N. Ala. Express, Inc. v. ICC, 971 F.2d 661, 666 (11th Cir.1992) (“Because the Tenth Amendment reserves only those powers not already delegated to the federal government, the Tenth Amendment has been violated only if [the federal law at issue] goes beyond the limits of Congress’ power under the Commerce Clause.”). Since the individual mandate falls within Congress’ commerce power, its enactment is a proper exercise of a power “delegated to the United States by the Constitution.” U.S. Const, amend. X. The Tenth Amendment, therefore, has no independent role to play. In short, the plaintiffs’ individual liberty claims find little support in the Constitution — whether pegged to the Fifth Amendment’s Due Process Clause or to the Tenth Amendment’s reservation of power to the people.
At bottom, Congress rationally concluded that the uninsured’s consumption of health care services, in the aggregate, shifts enormous costs onto others and thus substantially affects interstate commerce. The individual mandate directly and unambiguously addresses this cost-shifting problem by regulating the timing and means of payment for the consumption of these services. Congress also fairly determined that the mandate is an essential part of the Act’s comprehensive regulation of the health insurance market. I would, therefore, uphold the mandate as constitutional, and I respectfully dissent on this critical point.
APPENDIX A TO THE MAJORITY OPINION: OVERALL STRUCTURE OF ACT’S NINE TITLES
The Act’s nine Titles are:
I. Quality, Affordable Health Care for All Americans
*1366 II. Role of Public Programs
III. Improving the Quality and Efficiency of Health Care
IV. Prevention of Chronic Disease and Improving Public Health
V. Health Care Workforce
VI. Transparency and Program Integrity
VII. Improving Access to Innovative Medical Therapies
VIII. Community Living Assistance Services and Supports
IX. Revenue Provisions[1]
We outline here the structure and many of the key provisions in these nine Titles.
Title I reforms the business and underwriting practices of insurance companies and overhauls their health insurance products. Title I requires that private insurers change their practices and products and offer new and better health insurance policies for consumers. Title I’s hefty insurance reforms include: (1) elimination of preexisting conditions exclusions for children immediately, Act §§ 1201, 1255 (as re-numbered by §§ 10103(f), 10103(e));[2] (2) elimination of preexisting conditions for adults in 2014, §§ 1201, 1255 (as re-numbered by § 10103(f)); (3) elimination of annual and lifetime limits on benefits, §§ 1001, 10101(a); (4) required coverage for preventive services, § 1001; (5) immediate extension of dependent coverage up to age 26, § 1001; (6) imposition of a cap on insurers’ administrative costs in relation to their elaims-payments (the medical loss ratio), §§ 1001, 10101(f); (7) prohibition on excessive waiting periods to obtain coverage, §§ 1251, 10103(b); (8) guaranteed issue of coverage and guaranteed renewability in 2014, §§ 1201, 1255 (as renumbered by § 10103(f)(1)); (9) prohibition on rescission except on limited grounds, § 1001; (10) prohibition of coverage denial based on health status, medical condition, claims experience, genetic information, or other health-related factors, § 1201; (11) “community-rated” premiums, § 1201; (12) prohibition of discrimination based on salary, §§ 1001, 10101(d); (13) development and utilization of uniform explanation of coverage documents and standardized definitions, § 1001; (14) coverage appeals process, §§ 1001, 10101(g); and (15) insurance offerings for persons who retire before age 65, § 1102.
In addition to requiring insurers to offer new, improved health insurance products, Title I creates new state-run marketplaces for consumers to buy those new products, accompanied by federal tax credits and subsidies. Title I establishes state-administered Health Benefit Exchanges where both individuals and small groups can, and are encouraged to, purchase health insurance plans through non-profits and private insurers. §§ 1301-1421, 10104-10105. The Exchanges allow individuals, families, and small businesses to pool resources together and obtain premium prices competitive *1367 with those of large employer group plans. § 1311. The Exchange provisions include: (1) state flexibility to establish basic health programs for low-income individuals not eligible for Medicaid, § 1331; (2) transitional reinsurance program for sellers of insurance in the individual and small group markets in each state, § 1341; (3) establishment of a temporary risk corridor program for plans in individual and small group markets, § 1342; (4) refundable premium-assistance tax credit and reduced cost-sharing for individuals enrolled in qualified health plans, §§ 1401-02; (5) tax credits for small businesses’ employee health insurance expenses, § 1421; and (6) streamlining of enrollment procedures through the Exchanges, Medicaid, CHIP, and health subsidy programs, § 1413.
Title I next addresses employers. Title I imposes penalties on certain employers if they do not offer any, or an adequate, health insurance plan to their employees. § 1513. Title I contains provisions regarding “automatic enrollment” for employees of large corporations, reporting requirements, informing employees of coverage options, and offering of Exchange-participating health plans through “cafeteria” plans. §§ 1511-1515. Miscellaneous Title I provisions include transparency in government, equity for certain eligible survivors, health information technology enrollment standards and protocols, and prohibition against discrimination on refusal to furnish services or goods used to facilitate assisted suicide. §§ 1552, 1553, 1556, 1561.
Title I contains the individual mandate, which requires individual taxpayers either to purchase health insurance or pay a monetary penalty with their federal tax return. § 1501. Title I includes three exemptions from the mandate and five exceptions to the penalty, which together exclude many uninsured persons from the individual mandate. § 1501.
Title II shifts the Act’s focus to publicly-funded programs such as Medicaid, CHIP, and initiatives under the Indian Health Care Improvement Act. As to Medicaid, Title II’s provisions: (1) expand Medicaid eligibility to 133% of the federal poverty level, § 2001; (2) provide Medicaid coverage for former foster children, § 2004; (3) rescind the Medicaid Improvement Fund, § 2007; (4) permit hospitals to make presumptive eligibility determinations for all Medicaid-eligible populations, § 2202; (5) extend Medicaid coverage to freestanding birth center services and concurrent care to children, §§ 2301-02; (6) require premium assistance to Medicaid recipients for employer-sponsored coverage, § 2003; (7) provide a state eligibility option for Medicaid family planning services, § 2303; (8) create a Community First Choice Option for Medicaid, § 2401; (9) remove barriers to providing home- and community-based services through Medicaid, § 2402; (10) reauthorize Medicaid programs aimed at moving beneficiaries out of institutions and into their own homes or other community settings, § 2403; and (11) protect Medicaid recipients of home- and community-based services against spousal impoverishment, § 2404.
As to CHIP, Title II provides enhanced federal support and funding. § 2101. The Act: (1) reauthorizes CHIP through September 2015, § 10203; and (2) from October 2015 through September 2019, increases state matching rates for CHIP by 23 percentage points, up to a 100% cap, § 2101. Title II requires states to main *1368 tain CHIP eligibility through September 2019. § 2101.
Title II also amends and extends the Indian Health Care Improvement Act (“IHCIA”). § 10221. The Act’s IHCIA amendments, inter alia: (1) make the IHCIA’s provisions permanent; (2) expand programs to address diseases, such as diabetes, that are prevalent among the Indian population; (3) provide funding and technical assistance for tribal epidemiology centers; (4) establish behavioral health initiatives, especially as to Indian youth suicide prevention; and (5) authorize long-term care and home- and community-based care for the Indian health system. § 10221; see S.1790,111th Cong. (2009).
Title II’s provisions also create, or expand, other new publicly-funded programs that: (1) establish a pregnancy assistance fund for pregnant and parenting teens and women, § 10212; (2) fund expansion of State Aging and Disability Resource Centers, § 2405; (3) fund maternal, infant, and early childhood home visiting programs in order to reduce infant and maternal mortality, § 2951; (4) provide for support, education, and research for postpartum depression, § 2952; (5) support personal responsibility education, § 2953; (6) restore funding for abstinence education, § 2954; and (7) require inclusion of information about the importance of foster-care children designating a health care power of attorney for them as part of their transition planning for aging out of either foster care or other programs, § 2955.
Title III primarily addresses Medicare. Title III establishes new Medicare programs, including: (1) a value-based purchasing program for hospitals that links Medicare payments to quality performance on common, high-cost conditions, § 3001; (2) a Center for Medicare & Medicaid Innovation to research and develop innovative payment and delivery arrangements, § 3021; (3) an Independent Payment Advisory Board to present to Congress proposals to reduce Medicare costs and improve quality, §§ 3403, 10320(b); and (4) a new program to develop community health teams supporting medical homes to increase access to community-based, coordinated care, §§ 3502, 10321. Title III revises the Medicare Part D prescription drug program and reduces the so-called “donut hole” coverage gap in that program.[3] § 3301. Title III extends a floor on geographic adjustments to the Medicare fee schedule to increase provider fees in rural areas. § 3102.
Other sundry Medicare provisions in Title III include: (1) quality reporting for long-term care hospitals, inpatient rehabilitation hospitals, and hospice programs, § 3004; (2) permitting physician assistants to order post-hospital extended care services, § 3108; (3) exemption of certain pharmacies from accreditation requirements, § 3109; (4) payment for bone density tests, § 3111; (5) extensions of outpatient hold-harmless provisions, the Rural Community Hospital demonstration pro *1369 jeet, and the Medicare-dependent hospital program, §§ 3121, 3123-24; (6) payment adjustments for home health care, § 3131; (7) hospice reform, § 3132; (8) revision of payment for power-driven wheelchairs, § 3136; (9) payment for biosimilar biological products, § 3139; (10) an HHS study on urban Medicare-dependent hospitals, § 3142; (11) Medicare Part C benefit protection and simplification amendments, § 3202; and (12) an increase in premium amount for high-income Medicare Part D beneficiaries, § 3308. Title III also includes new federal grants for (1) improving women’s health, § 3509; (2) health care delivery system research, § 3501; and (3) medication management services in treatment of chronic diseases, § 3503.
Title IV concentrates on prevention. Title IV creates the National Prevention, Health Promotion, and Public Health Council, and authorizes $15 billion for a new Prevention and Public Health Fund to support initiatives from smoking cessation to fighting obesity. §§ 4001, 4002. Title IV authorizes new publicly-funded programs for (1) an oral healthcare prevention education campaign, § 4102; (2) Medicare coverage for annual wellness visits, § 4103; and (3) the operation and development of school-based health clinics, § 4101. Title IV also: (1) waives Medicare coinsurance requirements and deductibles for most preventive services, § 4104; and (2) provides states with an enhanced funds-match if the state Medicaid program covers certain clinical preventive services and adult immunizations, § 4106. Title IV further provides for: (1) Medicaid coverage of comprehensive tobacco cessation services for pregnant women, § 4107; (2) community transformation grants, § 4201; (3) nutrition labeling of standard menu items at chain restaurants, § 4205; (4) reasonable break time for nursing mothers and a place, other than a bathroom, which may be used, § 4207; (5) research on optimization of public health services delivery, § 4301; (6) CDC and employer-based wellness programs, § 4303; (7) advancing research and treatment for pain care management, § 4305; (8) epidemiology-laboratory capacity grants, § 4304; and (9) funding for childhood obesity demonstration projects, § 4306.
Title V seeks to increase the supply of health care workers through education loans, training grants, and other spending. Title V: (1) modifies the federal student loan program, § 5201; (2) increases the nursing student loan program, § 5202; and (3) establishes a loan repayment program for pediatric subspecialists, juvenile mental health providers, and public health workers who practice in underserved areas, § 5203. Title V also provides for: (1) state health care workforce development grants, § 5102; (2) a national health care workforce commission, § 5101; (3) nurse-managed health clinics, § 5208; (4) workforce diversity grants, § 5404; (5) training in general, pediatric, and public health dentistry, § 5303; (6) mental and behavioral health education and training grants, § 5306; (7) advanced nursing education grants, § 5309; (8) grants to promote the community health workforce, § 5313; (9) spending for Federally Qualified Health Centers, § 5601; and (10) reauthorization of the Wakefield Emergency Medical Services for Children program, § 5603. Title V addresses: (1) the distribution of additional residency positions, § 5503; and (2) rules for counting resident time for didactic and scholarly activities and in non-provider settings, §§ 5504-05.
*1370 Title VI creates new transparency and anti-fraud requirements for physician-owned hospitals participating in Medicare and for nursing facilities under Medicare or Medicaid. Title VI authorizes the HHS Secretary to (1) reduce civil monetary penalties for facilities that self-report and correct deficiencies, § 6111; and (2) establish a nationwide background-check program for employees of certain long-term support and service facilities, § 6201. Title VI also provides: (1) screening of providers and suppliers participating in Medicare, Medicaid, and CHIP, § 6401; and (2) new penalties for false statements on applications or contracts to participate in a federal health care program, § 6408.
Title VI also includes the Elder Justice Act, designed to prevent and eliminate elder abuse, neglect, and exploitation. § 6703. Other Title VI provisions include: (1) dementia and abuse prevention training, § 6121; (2) patient-centered outcomes research funded by a $2 fee on accident or health insurance policies, § 6301; (3) federal coordinating counsel for comparative effectiveness research, § 6302; (4) enhanced Medicare and Medicaid program integrity provisions, § 6402; (5) elimination of duplication between the Healthcare Integrity and Protection Data Bank and the National Practitioner Data Bank, § 6403; (6) reduction of maximum period for submission of Medicare claims to not more than 12 months, § 6404; (7) requirement for physicians to provide documentation on referrals to programs at high risk of waste and abuse, § 6406; (8) requirement of face-to-face encounter before physicians may certify eligibility for home health services or durable medical equipment under Medicare, § 6407; (9) prohibition on Medicaid payments to institutions or entities outside the United States, § 6505; (10) enablement of the Department of Labor to issue administrative summary cease-and-desist orders and summary seizure orders against plans in financially hazardous condition, § 6605; and (11) mandatory state use of the national correct coding initiative, § 6507.
Title VII extends and expands the drug discounts through the 340B program.[4] § 7101. Title VII establishes a process for FDA licensing of biological products shown to be biosimilar or interchangeable with a licensed biological product. § 7002.
Title VIII establishes a national voluntary long-term care insurance program for purchasing community living assistance services and support by persons with functional limitations. § 8002.
Title IX includes: (1) an excise tax on high-premium employer-sponsored health plans, § 9001; (2) an increase in taxes on distributions from individuals’ health savings accounts, § 9004; (3) increases in the employee portion of the FICA hospital insurance tax for employees with wages over certain threshold amounts, § 9015; (4) an additional tax of 3.8% on investment income above certain thresholds to fund Medicare, §§ 9001, 10901; HCERA § 1402; (5) a $2,500 limitation on individu *1371 als’ health flexible spending accounts under cafeteria plans, § 9005; (6) imposition of an annual fee on manufacturers and importers of branded prescription drugs, § 9008; (7) elimination of the tax deduction for expenses allocable to the Medicare Part D subsidy, § 9012; (8) a decrease in the itemized tax deduction for medical expenses, § 9013; and (9) an excise tax on indoor tanning services, § 10907. Title IX also provides for: (1) inclusion of the cost of employer-sponsored health coverage on W-2 forms, § 9002; (2) expansion of information-reporting requirements, § 9006; (3) additional requirements for hospitals to receive “charitable” designation and tax status, § 9007; (4) a study and report on the effect of the Act’s new fees on drug manufacturers and insurers on veterans’ health care, § 9011; (5) prohibition on health insurers’ deducting employee compensation over $500,000, § 9014; (6) tax credit for companies with fewer than 250 employees that are engaged in research on qualifying therapeutic discoveries, § 9023; and (7) establishment of simple cafeteria plans for small businesses, § 9022. Title IX assesses an annual fee on health insurance companies, which is apportioned among insurers based on a ratio designed to reflect each insurer’s share of the net premiums written in the United States health care market. §§ 9010, 10905; HCERA § 1406.

. I concur only in Parts I (standing), III (Medicaid expansion), and VI (taxing power) of the majority opinion.

. In 2009, the total number of uninsured was estimated at 50.7 million, or about 16.7% of the total population. U.S. Census Bureau, U.S. Dep't of Commerce, Income, Poverty, and Health Insurance Coverage in the United States: 2009, at 23 tbl.8 (2010), available at http://www.census.gov/prod/2010pubs/p60238.pdf. What’s more, the population of uninsured is not confined to those with low incomes. The Census Bureau found that the estimated income brackets for the uninsured are as follows:
(1) less than $25,000: 15.5 million uninsured, about 26.6% of the total population in this income bracket;
(2) $25,000 to $49,999: 15.3 million, about 21.4%;
(3) $50,000 to $74,999: 9.4 million, about 16.0%;
(4) $75,000 or more: 10.6 million, about 9.1%.

Id.

. These figures come from a study cited by both the plaintiffs and the government: Families USA, Hidden Health Tax: Americans Pay a Premium 2 (2009) [hereinafter Hidden Health Tax], available at http://familiesusa2. org/assets/pdfs/hidden-health-tax.pdf. And again, the problem of uncompensated care is not confined to those of limited means. Even in households at or above the median income, people without health insurance pay, on average, less than half the cost of the medical care they consume. See Bradley Herring, The Effect of the Availability of Charity Care to the Uninsured on the Demand for Private Health Insurance, 24 J. Health Econ. 225, 229-31 (2005).

. In response to South-Eastern Underwriters, Congress enacted the McCarran-Ferguson Act, which provides that state laws regulating insurance will not be "invalidate[d], impair[ed], or supersede!)!]” by federal law, unless the federal law "specifically relates to the business of insurance.” 15 U.S.C. § 1012(b). But this enactment in no way affects or diminishes the Court’s clear holding in SouthEastern Underwriters that Congress may, concurrently with the states, regulate the business of insurance under the Commerce Clause. What’s more, Congress has hardly abdicated its role in regulating the insurance business. See Humana Inc. v. Forsyth, 525 U.S. 299, 311, 314, 119 S.Ct. 710, 142 L.Ed.2d 753 (1999) (holding that federal RICO statute — which is itself grounded in the Commerce Clause — may be applied to insurers because it is not precluded by the McCarran-Ferguson Act); id. at 308, 119 S.Ct. 710 ("We reject any suggestion that Congress intended to cede the field of insurance regulation to the States....”). Rather, the McCarran-Ferguson Act sought "to protect state regulation primarily against inadvertent federal intrusion — say, through enactment of a federal statute that describes an affected activity in broad, general terms, of which the insurance business happens to constitute one part.” Barnett Bank of Marion Cnty., N.A. v. Nelson, 517 U.S. 25, 39, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996).

. While Medicaid prices are not as directly regulated at the federal level, Congress has legislated in a number of ways that affect the prices to be paid to health care providers and others under the Medicaid program. Most notable is the Medicaid Drug Rebate Program, created by the Omnibus Budget Reconciliation Act of 1990. The program provides that, if drug companies want their products to be covered by Medicaid, they must provide detailed price information to, and enter into a national rebate agreement with, the Secretary ofHHS. 42 U.S.C. § 1396r-8. Congress has thus regulated prescription drug prices under Medicaid by requiring drug companies to provide discounts to states — in the form of rebates — for their Medicaid drug purchases. See generally Iowa Dep’t of Human Servs. v. Ctrs. for Medicare & Medicaid Servs., 576 F.3d 885, 886-87 (8th Cir.2009).

. At oral argument, counsel for the state plaintiffs was explicitly asked whether, at the point of health care consumption, Congress "could compel an individual who doesn’t have health insurance to either pay a penalty or obtain insurance at that time,” to which counsel responded that "[i]n the health care market, at the time of consumption, yes.” And at the district court hearing on the government’s motion to dismiss, counsel for the plaintiffs made a similar concession. In response to the district court’s question, "Well, the government could impose this penalty at the point of service at the doctor’s office or the hospital and say, if you do not have insurance, you are subject to a penalty?,” counsel for the plaintiffs responded, “I believe the government would be able to do it, Your Honor.” RE 334-35.

. The majority opinion misapprehends this point. See Maj. Op. at 1294 n. 100. Consolidated Edison is cited along with Katzenbach to make this simple point: Congress need not *1340 wait until an economic problem has erupted and the national economy is disrupted before it may act prophylactically, under its commerce power, to address an obvious and apparent economic problem. That Consolidated Edison specifically involved the regulation of labor practices or that Katzenbach (along with Heart of Atlanta) specifically involved the regulation of innkeepers and restaurateurs is beside the point. This principle of Commerce Clause jurisprudence is general, and it remains binding law.

. The plaintiffs do not contest the validity of these data. Indeed, at oral argument, counsel for the state plaintiffs conceded that these visits to the emergency room constitute economic activity that Congress may lawfully regulate.

. Contrary to the majority's assertion, see Maj. Op. at 1302 n. 119, the conduct being regulated by Congress is the consumption of health care services by the uninsured. And it is the very act of consuming health care ser *1341 vices by those who do not pay for them that has the natural and probable effect of shifting costs to those who do — what occurs when I consume a good, and leave you with the bill. In every real sense, the conduct being regulated is analytically and conceptually distinct from its effects on interstate commerce.

. The Court in Raich specifically approved of Congress’ legislating across a broad class when "enforcement difficulties" would attend drawing the class more narrowly. Raich, 545 U.S. at 22, 125 S.Ct. 2195. The Court said, "[gliven the enforcement difficulties that at *1342 tend distinguishing between marijuana cultivated locally and marijuana grown elsewhere, and concerns about diversion into illicit channels, we have no difficulty concluding that Congress had a rational basis for believing that failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the CSA.” Id. (citation and footnote omitted). When it may be difficult to distinguish between categories of conduct, especially when the categories are fluid, Congress may enlarge the regulated class. Here, too, Congress may broadly regulate uninsured individuals because it may be difficult to distinguish between cost-shifters and non-cost-shifters. And the categories are fluid — a non-consumer or non-cost-shifter today may become a cost-shifter tomorrow, especially if a catastrophic injury befalls him. Moreover, the majority concedes that Congress may regulate all of the uninsured — cost-shifters and non-cost-shifters alike' — at the point of consumption. See Maj. Op. at 1294-95. Thus, by the majority's own lights, Congress' inclusion of non-cost-shifters within the mandate's reach does not create a constitutional infirmity-

. The majority attempts to skirt the breadth of the aggregation principle by claiming that an "individual's mere decision not to purchase insurance” is not subject to aggregation. Maj. Op. at 1292. But again, the majority has shot at the wrong target. Congress is regulating the uninsured’s uncompensated consumption of health care services. And under Wickard and Raich, we are instructed to measure the effect on interstate commerce not case-by-case or person-by-person, but rather in the aggregate and taken as a whole.

. During a hearing before the House Ways and Means Committee, an economist stated that “imposition of community-rated, premiums and guaranteed issue on a market of competing private health insurers will inexorably drive that market into extinction, unless these two features are coupled with ... a mandate on individual[s] to be insured." Health Reform in the 21st Century: Insurance Market Reforms: Hearing Before the H. Comm, on Ways and Means, 111th Cong. 13 (2009) (statement of Dr. Uwe Reinhardt, Professor, Princeton University). In other words, without a mandate, these two insurer reforms would result in adverse selection, increased premiums, decreased enrollment, and fleeing insurers — in short, the insurance market would “implode." See id. at 13 n. 4.

. I address the plaintiffs' suggestions that the individual mandate violates the Fifth or Tenth Amendments in Part II.B, infra.

. The majority comes perilously close to abandoning the central foundation — the dichotomy between activity and inactivity — on which the plaintiffs and the district court rely for their position that upholding the individual mandate would convert the Commerce Clause into an unlimited general police power. See Maj. Op. at 1286 ("[W]e are not persuaded that the formalistic dichotomy of activity and inactivity provides a workable or persuasive enough answer in this case.”). As I understand the position taken by the plaintiffs and the district court, it is this: if the Commerce Clause affords Congress the power to conscript the unwilling uninsured to enter the stream of commerce and buy insurance, then Congress could also conscript any American to buy any private product at a time and under circumstances not of his own choosing. In other words, the plaintiffs say, the individual mandate extends the Commerce Clause beyond its outer limits precisely because it allows the government to conscript the inactive and unwilling. Without drawing the distinction between activity and inactivity, I am at a loss to understand the argument that sustaining the individual mandate would transmute the limited power contained in Art. I, § 8, cl. 3 of the Constitution into an unlimited general police power. For reasons that remain inexplicable to me, the majority opinion seems to suggest that the individual mandate is a "bridge too far” — in the words of the district court — not because it conscripts the inactive, but rather for some inchoate reason stated at the highest order of abstraction.

. Although the majority seems to take comfort in only striking down the individual mandate, see Maj. Op. at 1328 n. 145, all of the parties have agreed that the individual mandate is so essential to the principal insurer reforms that, at least for severability purposes, the guaranteed issue and community rating provisions necessarily rise and fall with the individual mandate, Gov't Reply Br. at 58 ("As plaintiffs note, the federal government acknowledged below [and continues to acknowledge] that the guaranteed-issue and community-rating provisions due to take effect in 2014 ... cannot be severed from the minimum coverage requirement. The requirement is integral to those sections that go into effect along with it in 2014 and provide that insurers must extend coverage and set premiums without regard to pre-existing medical conditions.... ”); States Br. at 63 (stating that the individual mandate cannot be severed from “the core, interrelated health insurance reforms”); NFIB Br. at 60-61 (stating that the mandate and the principal insurer provisions “truly are the heart of the Act,” and highlighting the government’s concession that the mandate and the insurer reforms "must stand or fall together” (internal quotation marks omitted)).

. The unpredictability and wide variation in health care costs demonstrate why the majority's comparison of average health care costs to the average insurance premium misses the point. Maj. Op. at 1299.. Individuals pay $4500 in insurance premiums not to avoid the $2000 average annual medical bill, but to avoid the extreme medical bill. Indeed, the whole point of insurance is to make spending more regular and predictable. Comparing the "average” medical bill with the “average” insurance premium is hollow — insurance is *1358 purchased for the very reason that one cannot count on receiving the "average” medical bill every year.

. See Fla. Stat. Ann. § 395.1041(1); Idaho Code Ann. § 39-1391b; La.Rev.Stat. Ann. § 40:2113.4(A); Nev.Rev.Stat. Ann. § 439B.410(1); 35 Pa. Stat. Ann. § 449.8(a); S.C.Code Ann. § 44-7-260(E); Tex. Health & Safety Code Ann. § 311.022(a); Utah Code Ann. § 26-8a-501(l); Wash. Rev.Code § 70.170.060(2); Wis. Stat. Ann. § 256.30(2); see also GovT Br. at 35 (citing testimony before Congress in 1986 that at least 22 states had enacted statutes or issued regulations requiring provision of emergency medical services regardless of ability to pay, and observing that state court rulings impose a common law duty on doctors and hospitals to provide emergency care).

. See, e.g., Thompson v. Sun City Cmty. Hosp., Inc., 141 Ariz. 597, 688 P.2d 605, 610 (1984) ("[A]s a matter of public policy, licensed hospitals in this state are required to accept and render emergency care to all patients who present themselves in need of such care---- This standard of care has, in effect, been set by statute and regulation embodying a public policy which requires private hospitals to provide emergency care that is 'medically indicated’ without consideration of the economic circumstances of the patient in need of such care.”); Walling v. Allstate Ins. Co., 183 Mich.App. 731, 455 N.W.2d 736, 738 (1990) ("[L]iability on the part of a private hospital may be based upon the refusal of service to a patient in a case of unmistakable medical emergency.”).

. The Heritage Foundation has filed an amicus brief in support of the plaintiffs making clear that this excerpt does not reflect the policy of the Heritage Foundation or even the current beliefs of the speaker; both strongly dispute the efficacy and the constitutionality of the individual mandate. Brief for Heritage Found, as Amicus Curiae Supporting the Plaintiffs at 5-6. I do not doubt the sincerity of this position, and use this statement not to imply that the Heritage Foundation has blessed the individual mandate but rather only for the statement’s own value as a persuasively articulated description of an important distinction between health insurance, health care, and other markets.

. Contrary to the plaintiffs' suggestion, it is not problematic that Congress’ own legislation — EMTALA—may have contributed to the very market conditions that it sought to address in the Act. Significantly, EMTALA predated the individual mandate by over two decades, and was enacted for reasons wholly unrelated to the mandate. Moreover, EMTALA did not create a new federal obligation out of whole cloth and then impose it on health care providers; rather, it supplemented numerous state laws and overarching social judgments that the sick and injured should be cared for regardless of ability to pay. Nor should we be concerned that Congress might similarly enact legislation requiring companies to give away cars, food, or housing, and then accompany that legislation with a mandate prescribing the pre-purchase of a mechanism for financing those items. Not only is it *1360 wholly unrealistic that Congress would require companies to give away free cars or housing (even if it could do so) simply so that it could then impose an insurance requirement on those items, but cars and houses are also products not already predominantly financed through insurance. An insurance mandate thus would not be a well-suited means to regulate payment in those markets.

. Perhaps the closest analog to the individual mandate is a requirement that individuals buy other types of insurance. The district court rejected the government’s contention that the failure to buy health insurance is a "financing decision” by reasoning that "this is essentially true of any and all forms of insurance.” Florida, 780 F.Supp.2d at 1293, 2011 WL 285683, at *28; see also Maj. Op. at 1296. But of the examples suggested by the district court — supplemental income, credit, mortgage guaranty, business interruption, or disability insurance — none insures against risks or costs that are inevitable, or that will otherwise be subsidized by those with insurance, unlike the relationship between health insurance and health care services.

. The name refers, of course, to Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), where the Supreme Court struck down a New York law setting maximum hours for bakery employees on the ground. that it violated the right of contract, as protected by the Fourteenth Amendment’s Due Process Clause.

. See Is the Obama Health Care Reform Constitutional? Fried, Tribe and Barnett Debate the Affordable Care Act, Harvard Law School (Mar. 28, 2011), http://www.law. harvard.edu/news/spotlight/constitutional-law/ is-obama-health-care-reform-constitutional. html.

. Indeed, when asked at oral argument if the Tenth Amendment had been abandoned on appeal, counsel for the states reiterated that "the Tenth Amendment is still very much in this case,” and that "this is both an individual rights case and a Commerce Clause enumerated rights case.”

. In Bond v. United States, - U.S. -, 131 S.Ct. 2355, 180 L.Ed.2d 269 (2011), the Supreme Court recently held that an individual has prudential standing to "assert injury from governmental action taken in excess of the authority that federalism defines.” Id. at 2363-64. In other words, Carol Anne Bond had standing to raise federalism-based arguments in challenging the constitutionality of the criminal statute under which she was indicted, 18 U.S.C. § 229 (which prohibits the knowing development, acquisition, possession, or use of chemical weapons). Id. at 2360. It remains true, however, that the Court has never used the "people” prong of the Tenth Amendment to invalidate an act of Congress.

. There is also a tenth Title dedicated to amendments to these nine Titles. Although the amendments are actually located in Title X, we list the substance of the amendments under the Title being amended.

. In this Appendix, we provide citations to the sections of the Act. Our opinion's in-depth discussion of the contents of specific provisions, however, cites to the sections of the U.S.Code where each provision is now, or will be, codified.

. The Medicare Part D "donut hole” is the gap in prescription drug coverage, where beneficiaries' prescription drug expenses exceed the initial coverage limit but do not yet reach the catastrophic coverage threshold, meaning beneficiaries must pay 100% of those prescription drug costs. See 42 U.S.C. § 1395w-102(b)(3)(A), (b)(4) (2009). In 2006, the do-nut hole extended to yearly prescription drug expenses between $2,250 and $3,600, with values for later years adjusted by an annual percentage increase. See id.

. Section 340B of the Public Health Service Act, 42 U.S.C. § 256b, establishes a program whereby HHS enters into contracts with manufacturers of certain outpatient drugs under which the manufacturers provide those drugs at discounted prices to "covered entities”-— generally, certain enumerated types of federally funded health care facilities serving low-income patients. Id.; see generally Univ. Med. Cir. of S. Nev. v. Shalala, 173 F.3d 438, 439 (D.C.Cir.1999).